# Illinois Official Reports

## Appellate Court

---

**Chicago Sun-Times v. Chicago Transit Authority**, 2021 IL App (1st) 192028

---

| | |
|---|---|
| Appellate Court Caption | CHICAGO SUN-TIMES, Plaintiff-Appellee, v. THE CHICAGO TRANSIT AUTHORITY and THE CHICAGO POLICE DEPARTMENT, Defendants (The Chicago Transit Authority, Defendant-Appellant). |
| District & No. | First District, Fourth Division<br>No. 1-19-2028 |
| Filed | June 24, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CH-1234; the Hon. Anna Helen Demacopoulos, Judge, presiding. |
| Judgment | Reversed in part and vacated in part; cause remanded. |
| Counsel on Appeal | Karen G. Seimetz, Stephen L. Wood, and Irina Y. Dmitrieva, of Chicago Transit Authority, of Chicago, for appellant.<br><br>Joshua Burday, Matthew Topic, and Merrick Wayne, of Loevy & Loevy, of Chicago, for appellee. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Justice Martin concurred in the judgment and opinion.<br>Presiding Justice Gordon concurred in part and dissented in part. |

**OPINION**

¶ 1 The plaintiff, the Chicago Sun-Times (Sun-Times), sued the defendants, the Chicago Transit Authority (CTA) and the Chicago Police Department (CPD), seeking disclosure under Illinois's Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2016)) of surveillance video of a subway platform that showed one customer pushing another customer off the platform. The parties filed cross-motions for summary judgment, and the circuit court, after conducting an *in camera* review of the video, granted summary judgment in favor of the Sun-Times and against the CTA and CPD and ordered defendants to produce the video. The circuit court stayed enforcement of this order pending this appeal.

¶ 2 On appeal, the CTA argues that the security-sensitive video footage was exempt from disclosure under the provision concerning security measures in section 7(1)(v) of FOIA (*id.* § 7(1)(v)) because disclosure could reasonably be expected to jeopardize the effectiveness of the CTA's surveillance system.

¶ 3 For the reasons that follow, we reverse the circuit court's grant of summary judgment in favor of the Sun-Times and against the CTA and CPD; enter summary judgment in favor of the CTA and CPD and against the Sun-Times; vacate the order requiring the disclosure of the surveillance video footage; and remand this matter to the circuit court on the remaining issue of attorney fees, costs, and civil penalties.

¶ 4                                    I. BACKGROUND

¶ 5 Shortly before midnight on August 1, 2017, an assailant pushed a CTA customer waiting for a train off the platform and onto the tracks at the Washington Blue Line subway station. With the help of other passengers, the customer climbed back onto the platform, and the assailant ran off. Most of the incident was caught on three of the surveillance cameras installed at that station's rail platform. The CPD used the CTA's surveillance footage to identify and apprehend the assailant, who, on October 11, 2017, was charged with attempted murder.

¶ 6 On October 16, 2017, the Sun-Times filed a FOIA request with the CTA for "video surveillance footage from the Blue Line platform at 19 N. Dearborn Aug. 1 at around 11:30 p.m. to 1 a.m., showing a passenger being pushed from the platform by another man, and falling onto the tracks."

¶ 7 On October 24, 2017, the CTA denied the request based on the security measures provision of section 7(1)(v) of FOIA, which exempts from disclosure

> "security measures *** that are designed to identify, prevent, or respond to potential attacks upon a community's population or systems, facilities, or installations, the destruction or contamination of which would constitute a clear and present danger to the health or safety of the community, but only to the extent that disclosure could reasonably be expected to jeopardize the effectiveness of the measures." *Id.*

The CTA explained that its rail station cameras are a security measure designed to identify and respond to potential attacks on the CTA's rail system and the "disclosure of this video footage would reveal the position of the cameras installed in the CTA's train station, the capabilities of the cameras, the area captured by the cameras and the areas where the view of the cameras cannot reach." The CTA further explained that public disclosure of this information could jeopardize the effectiveness of its security cameras because "individuals who are planning

- 2 -

criminal activity will know exactly what areas they need to avoid in order to escape detection by these cameras, and even more concerning, what areas are unmonitored and most vulnerable to attacks."

¶ 8        A few days later, the Sun-Times submitted a FOIA request to the CPD, seeking the same surveillance video from the rail platform it sought from the CTA. On December 22, 2017, the CPD denied the request, citing several FOIA exemptions, including section 7(1)(v).

¶ 9        On January 30, 2018, the Sun-Times filed its complaint for declaratory and injunctive relief under FOIA against the CTA and CPD. Counts I and II of the complaint asserted claims for willful violation of FOIA against the CTA and the CPD, respectively. In addition to the video records, the Sun-Times also sought attorney fees and costs, as well as civil penalties against both defendants.

¶ 10       Meanwhile, the State instituted criminal proceedings against the assailant. On June 8, 2018, the criminal court entered a protective order governing discovery in that case. The protective order enjoined the CTA and CPD from disclosing "any and all materials that may be relevant to the defense or prosecution" of the assailant, including "all surveillance footage of the Chicago Blue Line tracks located at 19 N. Dearborn, Chicago, Illinois on August 1, 2017 and August 2, 2017."

¶ 11       The parties brought the June 8, 2018, protective order to the attention of the circuit court judge presiding over this FOIA action, which was then essentially put on hold while the State pursued its criminal case. In January 2019—after the criminal proceedings were over and the criminal court vacated its protective order—the proceedings in this FOIA action resumed.

¶ 12       The parties filed cross-motions for summary judgment. The CTA maintained that surveillance video from its rail platforms was exempt from disclosure under FOIA's section 7(1)(v) as "security measures," the effectiveness of which could be jeopardized by public disclosure. The CTA stated that, unlike cameras on board its trains and buses, the rail platform cameras "are funded by the Department of Homeland Security specifically to prevent terrorism on the mass transit system." The rail platform cameras also could be used by law enforcement personnel to view a live feed of events happening in real time. Accordingly, if an incident were to occur on a subway platform, the Office of Emergency Management and Communications and CTA security could be notified immediately to begin to view the video live and direct first responders to that incident. However, if someone knew beforehand where to hide to avoid being seen on these cameras, that person would be in the perfect position to attack the first responders. Moreover, a well-known terrorist tactic involves luring first responders to the scene of an emergency and then committing an attack on them. The CTA explained that, due to these security concerns, it followed a uniform policy to not publicly disclose videos from the cameras inside its rail stations.

¶ 13       In support of its motion, the CTA submitted three affidavits—the affidavits of its two FOIA officers, Ashley Neuhauser and Brigett Bevan, and of a homeland security expert, Michael Fagel, Ph.D.

¶ 14       In her affidavit, Neuhauser averred that the video footage at issue here came from three separate CTA surveillance cameras located on the Washington Blue Line platform. The footage showed "only paid, secure areas of the CTA platform and [did] not include any views of a public right of way."

¶ 15     In her affidavit, Bevan averred that, due to security concerns, the CTA does not authorize the public release of video footage from CTA's rail facility cameras in the interior of its stations, including the platform area.

¶ 16     Fagel, who works for a national consortium that trains state and local emergency responders, averred that, in preparing his affidavit, he rode the CTA, viewed the surveillance features on the platforms, and met with the CTA's security department to discuss its surveillance camera network. He also viewed the video footage at issue in this case. Based on his expertise and additional research into terrorism on mass transit systems, Fagel stated that terrorist organizations, including al Qaeda and the Islamic State, were willing to target mass transit systems to achieve mass casualties. This included the strategy of derailing trains and planting bombs in locations with little or no surveillance, no security perimeters to penetrate, and few, if any, armed guards to respond. Fagel stated that, while surveillance cameras "have some deterrent value when it comes to preventing terrorist attacks" on mass transit systems, they play "an important role" in "identify[ing] attackers" and in "responding to terrorist plots."

¶ 17     With respect to the CTA's rail platform cameras, Fagel stated that they were designed as a security measure to preserve critical infrastructure, and are used by CTA security personnel and local law enforcement to identify and respond to attacks. Fagel stated that releasing the videos would publicize currently unknown security information such as the cameras' individual and collective fields of view and blind spots. He also stated that public disclosure of this information "would minimize or bypass the benefits provided by the surveillance cameras" by enabling potential attackers "to evade these security devices when targeting passengers, planning attacks, or evading capture by law enforcement."

¶ 18     In opposing the CTA's arguments, the Sun-Times claimed that the CTA failed to prove by clear and convincing evidence that its rail platform videos were exempt from public disclosure under section 7(1)(v) of FOIA. In support of its motion, the Sun-Times submitted the affidavits of Patrick Eddington, a Cato Institute research fellow, and David Bradford, a former police officer and a director of Northwestern University's public safety center. Neither Eddington nor Bradford stated that they viewed the videos at issue in this case or ever visited the CTA's Washington Blue Line platform where the surveillance cameras were located.

¶ 19     In his affidavit, Eddington challenged Fagel's assertion that video surveillance cameras in mass transit systems provided any preventive or predictive security against any kind of assault or attack. Eddington stated that viewing the camera videos was not the only way to identify the cameras' field of view and blind spots. Eddington stated that any member of the public who can see surveillance cameras at CTA stations "can already determine with a reasonable degree of certainty whether any CCTV camera blind spots exist and the extent and location of those blind spots." Additionally, Eddington stated that whether or not an individual camera has blind spots could be determined by analyzing

>"the camera's field of view under factory settings; the placement of a given camera; the kind of lense(s) on the camera (wide angle, fish eye, etc.); whether software enhancement is used to improve the camera's field of view, resolution, etc.; and whether the camera in question is the sole source of video at the building or facility at which it has been place[d]."

Eddington also contended that revealing the cameras' blind spots would not endanger CTA security because there was "no evidence of any terrorist plot stopped in advance through video surveillance of a mass transit system."

¶ 20        Bradford also opined that viewing the video footage was not the only means to identify the field of view and blind spots. Specifically, mathematical formulas would reveal the camera's field of view. Also, there was "the rule of thumb" that "if you cannot see the camera, the camera cannot see you." Bradford opined that the easiest way to commit a crime without being detected would be to visit the facility and observe the location of the cameras and determine any blind spots. Bradford also stated that viewing the video footage might not reveal the total maximum area view available to the camera because that area view could be modified by the aperture setting for the lens. Bradford opined that releasing the camera footage "would in no way endanger CTA security" because, according to the CTA's press releases, the CTA's system was saturated with cameras that recorded criminal activity no matter where it occurred.

¶ 21        In replying to the Sun-Times' arguments, the CTA stated that the Sun-Times sought to hold it to a higher standard of proof than the standard set forth in section 7(1)(v). In particular, the CTA pointed out that section 7(1)(v) did not require it to show that its security measures could actually prevent a terrorist attack—only that they were "designed to identify, prevent, or respond to potential attacks." The CTA also argued that section 7(1)(v) did not require it to show that disclosure of the videos would actually threaten public safety but only that it could reasonably be expected to jeopardize the effectiveness of the CTA's safety measures.

¶ 22        On August 7, 2019, the court held a hearing on the parties' cross-motions for summary judgment. At the hearing, the CTA's counsel stated that informing the public about surveillance cameras on the CTA system served as a deterrent and people felt safer on the system. But the CTA did not "go around saying well there are blind spots and here is where they are" due to security concerns. Counsel further stated that the video revealed that the victim of the attack was standing in a blind spot of all three cameras and could not be seen for a significant amount of time. Accordingly, counsel argued that anybody who watched the video would be able to immediately identify a hole in the CTA's security network.

¶ 23        The CTA's counsel also stated that the CTA's concern went beyond the facts of this particular case and was about the implications of the court's ruling on future FOIA requests. Specifically, if the court found that revealing the cameras' blind spots was not a sufficient basis to invoke section 7(1)(v), the CTA would not be able to deny similar FOIA requests in the future, and "somebody who does wish to seek to attack a mass transit system *** can certainly take advantage of that in planning their attacks or an attack on first responders."

¶ 24        Although the court acknowledged the strength of the CTA's argument regarding terrorist groups accessing the surveillance video of mass transit systems, the court stated that the CTA could not point to specific evidence that any terrorist attack was "a direct result of [surveillance camera footage] being published."

¶ 25        On August 14, 2019, the circuit court, after conducting an *in camera* review of the videos, entered a written order denying the CTA's and CPD's summary judgment motions, granting the Sun-Times' summary judgment motion, and ordering the videos produced, with the faces of the involved individuals blurred or redacted, within 14 days. The order also stated that this ruling was specific to the facts of this case and was not binding on future FOIA requests to the CTA and CPD.

¶ 26        According to the transcript of this proceeding, the court stated that although Fagel's affidavit generally stated that disclosure of the video footage would reveal the location of the cameras and the blind spots that could subject the mass transit system to potential terrorist attacks, his affidavit failed to specifically state that the disclosure was detrimental to such a

- 5 -

degree that it jeopardized the effectiveness of the surveillance camera system. The court stated that the location of the cameras was not easily detected from viewing the video footage at issue here and anyone on the station platform could determine the location of the blind spots. The court also stated that if the defendant in the criminal case had not pled guilty then the video footage would have been played in open court. Accordingly, the court, applying the clear and convincing evidence standard, concluded that the disclosure of the video footage "does not" and "would not in any way jeopardize the effectiveness of the [security] measures or the safety of the personnel who implement them or the public."

¶ 27    On September 13, 2019, the circuit court entered an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), finding that there was no just reason to delay appeal of the August 14, 2019, order and staying its enforcement. The CTA timely appealed.

¶ 28                                   II. ANALYSIS

¶ 29    This case arises from the disposition of cross-motions for summary judgment. Summary judgment is proper when the pleadings, depositions, admissions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016). Where the parties have filed cross-motions for summary judgment, they have conceded that there are no genuine issues of material fact and have agreed that only questions of law are involved. *Nationwide Financial, LP v. Pobuda*, 2014 IL 116717, ¶ 24. In such a situation, the parties request that the court decide the issues as a matter of law. *Id.* We review *de novo* the trial court's judgment on cross-motions for summary judgment. *Id.*; see also *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 63 (under *de novo* review, the reviewing court performs the same analysis the trial court would perform).

¶ 30    The CTA argues that it was entitled to summary judgment because it met its burden under the plain language of FOIA's section 7(1)(v) to show by clear and convincing evidence that the surveillance camera footage at issue here was exempt from disclosure since its disclosure could reasonably be expected to jeopardize the effectiveness of the CTA's video surveillance network by disclosing its vulnerabilities. Specifically, the footage revealed the areas captured by the cameras, the clarity and resolution of the images, and most importantly the areas that were beyond the cameras' collective reach—their blind spots. The CTA argues that, in the wrong hands, this security-compromising information could be used to plant explosive devices and potentially result in mass casualties, jeopardize rescue personnel, and help criminals evade detection and capture following a crime.

¶ 31    The CTA argues that the circuit court misconstrued and misapplied the law by requiring the CTA to show by clear and convincing evidence that revealing the view of the three different camera angles in this particular case *would* jeopardize the effectiveness of the surveillance system and *would* result in a terrorist attack or other criminal act. The CTA argues that in the aftermath of the September 11, 2001, terrorist attacks, the General Assembly crafted a much more flexible standard, which imposed a relatively low burden on a government agency to invoke the section 7(1)(v) exemption. The CTA contends that all an agency has to show is that disclosure *could reasonably be expected to jeopardize* the effectiveness of its security measures, *i.e.*, a reasonable expectation that disclosing a record could risk undermining the effectiveness of its security measures. According to the CTA, when the General Assembly adopted the broad statutory language of section 7(1)(v), it made the policy choice that the need

to ensure public safety and avoid mass casualties took precedence over the public's right of access to government records when releasing those records created a risk of making critical infrastructure more vulnerable to potential attacks.

¶ 32 The Sun-Times argues that the circuit court conducted a careful review of the record and an *in camera* review of the footage and properly concluded that any blind spots were easily visible through observation at the station already and thus the footage was not exempt under FOIA section 7(1)(v). The Sun-Times also argues that the expert evidence supported the circuit court's decision.

¶ 33 The central issue of this case is the interpretation of the exemption in section 7(1)(v) of FOIA regarding the disclosure of security measures. Although the CTA also argues on appeal that the trial court erroneously made a factual finding regarding the disclosure of blind spots in the footage that was not supported by the evidence, we do not address that issue. As discussed above, by raising cross-motions for summary judgment, the parties concede that there is no genuine issue of material fact and agree that only questions of law are involved. Moreover, our review of the trial court's ruling is *de novo*, and the footage was available for this court's *in camera* review.

¶ 34 Contrary to the dissent's analysis, there is no genuine issue of material fact precluding summary judgment. As set forth in the parties' evidence in support of their summary judgment motions and the trial court's *in camera* review, there is no dispute that a person on the subway platform can see the locations of the security cameras and thereby get a general sense of the cameras' ability to record various areas. Regarding public disclosure of the video footage, the CTA argues that a viewer would gain information regarding the quality and resolution of the cameras, including more precise information regarding their blind spots. The Sun-Times concedes that the footage reveals information regarding the cameras' quality, clarity, and blind spots but argues that this same information can be obtained from mathematical calculations or information about the cameras' factory settings. The trial court agreed that the footage revealed information about the cameras' locations and blind spots but thought that this information was not easily discernable from the footage as compared to being very apparent to someone standing on the subway platform.

¶ 35 When interpreting a statute, we must ascertain and give effect to the legislature's intent. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 24. The best indication of that intent is the language employed in the statute, given its plain and ordinary meaning. *Id.* When the statute's language is unambiguous, we may not depart from that language by reading into it exceptions, limitations, or conditions unexpressed by the legislature; likewise, we may not add provisions under the guise of interpretation. *Id.* Moreover, when the statute is unambiguous, we apply the statute without resort to other aids of statutory construction. *Palm v. Holocker*, 2018 IL 123152, ¶ 21. If, however, the meaning of the statute is unclear, we may consider the purpose behind the law and the evils the law was intended to remedy. *Id.* We have an obligation to construe statutes in a manner that avoids absurd, unreasonable, or unjust results that the legislature could not have intended. *Id.*

¶ 36 The Illinois Supreme Court has stated that:

"FOIA expressly declares its underlying public policy and legislative intent. Section 1 provides that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of

this Act. [Citation.] Section 1 explains that [s]uch access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest. [Citation.] Consequently, section 1 provides that [i]t is a fundamental obligation of government to operate openly and provide public records as expediently and efficiently as possible in compliance with this Act. [Citation.]

Based on this clear expression of legislative intent, this court has held that public records are presumed to be open and accessible. [Citation.] FOIA is to be liberally construed to achieve the goal of providing the public with easy access to government information. [Citation.] Consequently, FOIA's exceptions to disclosure are to be construed narrowly so as not to defeat the intended statutory purpose. [Citation.] Thus, when a public body receives a proper request for information, it must comply with that request unless one of FOIA's narrow statutory exemptions applies." (Internal quotation marks omitted.) *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶¶ 24-25.

If a public body invokes a FOIA exemption, it "has the burden of proving that [the record] is exempt by clear and convincing evidence." 5 ILCS 140/11(f) (West 2016).

¶ 37    Section 7(1)(v) of FOIA provides that the following shall be exempt from inspection and copying:

"(v) Vulnerability assessments, security measures, and response policies or plans *that are designed to identify, prevent, or respond to potential attacks upon a community's population or systems, facilities, or installations, the destruction or contamination of which would constitute a clear and present danger to the health or safety of the community, but only to the extent that disclosure could reasonably be expected to jeopardize the effectiveness of the measures* or the safety of the personnel who implement them or the public. Information exempt under this item may include such things as details pertaining to the mobilization or deployment of personnel or equipment, to the operation of communication systems or protocols, or to tactical operations." (Emphasis added.) *Id.* § 7(1)(v).

Our research indicates that Illinois courts have not construed the language in section 7(1)(v) at issue in this case.[1] However, the "General Assembly patterned FOIA after the federal FOIA" and, thus, "Illinois courts often look to federal case law construing the federal FOIA for guidance in construing FOIA." *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶¶ 54-55.

¶ 38    The phrase "could reasonably be expected to" appears several times in section 7 of the federal FOIA, which exempts from disclosure records compiled for law enforcement purposes if their disclosure (1) "*could reasonably be expected to* interfere with enforcement proceedings," (2) "*could reasonably be expected to* constitute an unwarranted invasion of personal privacy," (3) "*could reasonably be expected to* disclose the identity of a confidential

---

[1]In *Lucy Parsons LABS v. City of Chicago Mayor's Office*, 2021 IL App (1st) 192073, ¶¶ 15-21, where the city established that some parts of its requested action plan were exempt under the FOIA exception applying to response plans, this court construed the phrase "but only to the extent that" in section 7(1)(v) to require the city to redact the exempt information and produce the nonexempt information even if the redactions left the requestor with nothing useful. This court's construction in *Lucy* of the "but only to the extent that" phrase is not pertinent to the issue raised in this case.

source," (4) would disclose techniques and procedures or guidelines "for law enforcement investigations or prosecutions if such disclosure *could reasonably be expected to* risk circumvention of the law," or (5) "*could reasonably be expected to* endanger the life or physical safety of any individual." (Emphases added.) 5 U.S.C. § 552(b)(7) (2018). The phrase "could reasonably be expected to" replaced the words "would" in section 7 of the federal FOIA as a result of a legislative amendment in 1986. Freedom of Information Reform Act of 1986, Pub. L. No. 99-570, § 1802, 100 Stat. 3207-48 (1986). Since then, federal courts consistently construed this phrase as significantly easing the government's burden to invoke the federal FOIA exemptions.

¶ 39    In *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 771 (1989), the United States Supreme Court ruled that an FBI rap sheet was exempt from disclosure as a law enforcement record that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." (Emphasis and internal quotation marks omitted.) The Court pointed out that the phrase "could reasonably be expected to constitute" was "the product of a specific amendment" that established a "more flexible standard." *Id.* at 756, 756 n.9. Quoting legislative history, the Court stressed that "the move from the 'would constitute' standard to the 'could reasonably be expected to constitute' standard represent[ed] a considered congressional effort 'to ease considerably a Federal law enforcement agency's burden in invoking [Exemption 7].' " *Id.* at 756 n.9 (quoting 132 Cong. Rec. 31424 (1986)).

¶ 40    Federal appellate courts have explained that the new standard "takes into account the 'lack of certainty in attempting to predict harm.' " *Spannaus v. U.S. Department of Justice*, 813 F.2d 1285, 1288 (4th Cir. 1987) (quoting S. Rep. No. 98-221, at 24 (1983)). Therefore, to invoke section 7 exemptions, government agencies no longer needed to establish that release of a particular document would actually result in tangible harm. See *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1037 (7th Cir. 1998) (agency "need not establish that release of a particular document would actually interfere with an enforcement proceeding" (emphasis omitted)). Rather, an agency's showing was "measured by a standard of reasonableness." *Spannaus*, 813 F.2d at 1288.

¶ 41    In *Mayer Brown LLP v. Internal Revenue Service*, 562 F.3d 1190 (D.C. Cir. 2009), the court ruled that the settlement strategies of the Internal Revenue Service (IRS) were exempt as law enforcement records, the disclosure of which " 'could reasonably be expected to risk circumvention of the law.' " *Id.* at 1193 (citing 5 U.S.C. § 552(b)(7)(E)). The court acknowledged that FOIA exemptions were construed narrowly, but stressed that "broad language—even when construed narrowly—is still broad language." *Id.* at 1194. The court noted that the legislature had phrased the exemption in such broad terms that showing the "[r]isk of circumvention [was] not required—only an expectation of such a risk. Moreover, this expectation of a risk *** need not be undeniable or universal; the risk need only be '*reasonably*' expected." Furthermore, "the exemption [did] not force the IRS to show this reasonably expected risk with certainty—only that disclosure '*could* reasonably be expected' to create such a risk." (Emphasis in original). *Id.* at 1193; accord *Blackwell v. Federal Bureau of Investigation*, 646 F.3d 37, 42 (D.C. Cir. 2011) (amended language set a relatively low bar for the agency to justify withholding; instead of meeting the highly specific burden to show how the law would be circumvented, the agency only had to demonstrate logically how the release of the requested information might create a risk of circumvention of the law).

¶ 42    In *Public Employees for Environmental Responsibility v. United States Section, International Boundary & Water Comm'n*, 740 F.3d 195 (D.C. Cir. 2014), the court ruled that the government's inundation maps were exempt as law enforcement records, the disclosure of which " 'could reasonably be expected to endanger the life or physical safety of any individual.' " *Id.* (quoting 5 U.S.C. § 552(b)(7)(F)). The court explained that information in the maps could be used in planning potential terrorist attacks on two dams at the United States/Mexico border. *Id.* at 206. In construing the very broad language of this exemption, the court stated that it did

> "not require concrete evidence in every case. The terms 'could' and 'expected' in Exemption 7(F) evince congressional understanding of the many potential threats posed by the release of sensitive agency information. An agency therefore need only demonstrate that it reasonably estimated that sensitive information could be misused for nefarious ends." *Id.*

¶ 43    Like exemption 7 of the federal FOIA, exemption 7(1)(v) of the Illinois FOIA is worded broadly and requires a government agency to demonstrate that release of a document "could reasonably be expected to" jeopardize the effectiveness of its security measures—not that it *would* jeopardize them. 5 ILCS 140/7(1)(v) (West 2016). The General Assembly knew the difference between the use of the term *could* instead of *would*; it had used the word "would" in other FOIA exemptions. See, *e.g.*, *id.* § 7(1)(c), (d), (k), (u). Moreover, the General Assembly adopted exemption 7(1)(v) in 2003, which was 17 years after Congress had replaced the word "would" with the phrase "could reasonably be expected to" in section 7 of the federal FOIA. Therefore, it is reasonable to assume that the General Assembly was aware that federal courts consistently construed this amendment to provide for a more flexible, less onerous standard to invoke a FOIA exemption.

¶ 44    Accordingly, we conclude that the very broad language of section 7(1)(v) of FOIA does not require an agency to prove, by clear and convincing evidence, that releasing a particular record would in fact diminish the effectiveness of its security measures. Rather, the agency must meet the lesser burden to show that it could reasonably be expected that the release of the record could jeopardize the effectiveness of the agency's security measures. By making this showing, the agency establishes by clear and convincing evidence that the particular record is exempt from disclosure.

¶ 45    Our *de novo* review of the record indicates that the CTA met that burden. Section 7(1)(v) did not require the CTA to prove with certainty that the disclosure of information regarding the cameras' blind spots would actually jeopardize its security measures. Rather, all that the CTA had to show was that it reasonably estimated that making this information public could risk making its security measures less effective.

¶ 46    The parties do not dispute that the CTA's facilities are a part of the state's critical transportation infrastructure and their destruction or contamination would constitute a clear and present danger to the health or safety of the riding public. Fagel, the CTA's homeland security expert, cited in his affidavit examples of terrorist attacks on mass transit systems, all of which resulted in casualties within the community attacked. Specifically, Fagel cited (1) the March 11, 2004, train bombing in Madrid, Spain, resulting in 191 fatalities and over 1500 injuries; (2) the July 7, 2005, train bombing in London, United Kingdom, resulting in 39 fatalities and 1000 injuries; (3) the 2010 Metro bombings in Moscow, Russia, resulting in 40

fatalities and 102 injuries; and (4) the March 22, 2016, bombings at the Maalbeek metro station in Brussels, Belgium, resulting in 16 fatalities and more than 100 injuries.

¶ 47　　Although the Sun-Times' experts asserted that there was no evidence that a mass transit system's video surveillance ever prevented any terrorist plot or any kind of assault or attack, that was not the CTA's burden under section 7(1)(v), which also applies to security measures designed to identify or respond to potential attacks. Moreover, the plain language of section 7(1)(v) refers to "potential attacks," not actual attacks.

¶ 48　　The CTA showed that the surveillance camera network inside its rail stations was "designed to identify, prevent, or respond to potential attacks" on its transit facilities. Specifically, the CTA explained that it began installing surveillance cameras inside its rail stations in 2002, in the aftermath of the September 11, 2001, terrorist attacks. The project was funded in part by the Department of Homeland Security through a grant program that was set up to help protect the public and the nation's critical transportation infrastructure against acts of terrorism and other large-scale events. The CTA also explained that the surveillance cameras inside its rail stations performed the dual functions of (1) recording video that can be retrieved on demand and shared with law enforcement authorities to investigate a crime and (2) providing live feeds to the CTA's security department and local law enforcement, which can be used to direct rescue personnel and provide real-time intelligence to responding law enforcement personnel.

¶ 49　　The CTA sufficiently demonstrated that disclosure of its surveillance camera footage from the rail platform could reasonably be expected to jeopardize the effectiveness of its security measures. The CTA's expert, Fagel, who trains emergency responders, visited the CTA stations, viewed the surveillance features on the platforms, and reviewed the videos at issue in this case. He averred that the videos contained security information that was not currently public. Specifically, the videos revealed the quality, resolution, field of view, and blind spots of the CTA's surveillance cameras, and that information could enable individuals to evade these security devices when targeting passengers, planning attacks, or evading capture by law enforcement.

¶ 50　　Although the Sun-Times' experts claimed that the easiest way to identify the cameras' blind spots was to visit the rail platform and observe the location of the cameras, they did not dispute the fact that viewing the cameras' footage disclosed information regarding blind spots and the quality of the recording. Moreover, the undisputed evidence established that simply locating the cameras on the platform would not provide the public with information about the type of lenses in these cameras or the aperture setting for the lenses at the time of recording, which could be different from the factory settings. Moreover, observing the cameras from afar would not provide information about their depth of field and the image's clarity or whether any software enhancements are used to improve the cameras' visual output. The easiest way to know precisely what areas the cameras capture, and at what resolution, would be to watch the cameras' visual output.

¶ 51　　We conclude that the CTA met its burden under section 7(1)(v) to show that disclosing the surveillance footage could reasonably be expected to jeopardize the effectiveness of its camera surveillance system. Thus, the CTA established by clear and convincing evidence that the surveillance footage was exempt from disclosure under FOIA.

¶ 52                                            III. CONCLUSION

¶ 53        For the foregoing reasons, we reverse the circuit court's judgment in favor of the Sun-Times and against the CTA and CPD on the parties' cross-motions for summary judgment; enter summary judgment in favor of the CTA and CPD and against the Sun-Times; vacate the order requiring the disclosure of the surveillance video footage; and remand this matter to the circuit court on the remaining issue of attorney fees, costs, and civil penalties.

¶ 54        Reversed in part and vacated in part; cause remanded.

¶ 55        PRESIDING JUSTICE GORDON, concurring in part and dissenting in part:

¶ 56        I agree with the majority that the summary judgment order entered in favor of the plaintiff Chicago Sun-Times must be reversed; however, my reasons differ from that of the majority, so I must write separately. In this case, the trial judge made an *in camera* investigation of the video that is the subject matter of this appeal and made factual determinations that a court cannot do in deciding a case based on a summary judgment. The facts in this case are highly disputed and thus cannot be decided on a motion for summary judgment. The majority instead finds summary judgment in favor of defendant CTA, where again there are factual issues that can only be decided by a trial on the merits.

¶ 57        Section 2-1005 of the Code of Civil Procedure (Code) permits a trial court to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." 735 ILCS 5/2-1005(c) (West 2016). Summary judgment is a drastic measure that should be granted only if the movant's right to judgment, as a matter of law, is clear and free from doubt. *A.M. Realty Western L.L.C. v. MSMC Realty, L.L.C.*, 2016 IL App (1st) 151087, ¶ 85; *Pekin Insurance Co. v. Roszak/ADC, LLC*, 402 Ill. App. 3d 1055, 1059 (2010); see also 735 ILCS 5/2-1005(c) (West 2016) (summary judgment may be granted only if "the moving party is entitled to a judgment as a matter of law"). In making this determination, the court must view the relevant documents in the light most favorable to the nonmoving party. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 85; *Pekin Insurance*, 402 Ill. App. 3d at 1058-59.

¶ 58        A party moving for summary judgment bears the initial burden of proof. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86; *Erie Insurance Exchange v. Compeve Corp.*, 2015 IL App (1st) 142508, ¶ 15. The movant may meet its burden of proof either by affirmatively showing that some element of the case must be resolved in its favor or by establishing the absence of evidence to support the nonmovant's case. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86; *Erie Insurance*, 2015 IL App (1st) 142508, ¶ 15. As for the nonmovant who is trying to withstand a summary judgment motion, that party " ' "need not prove [its] case at this preliminary stage but must present some factual basis that would support [its] claim." ' " *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86 (quoting *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002), quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)); see *JPMorgan Chase Bank, National Ass'n v. Jones*, 2019 IL App (1st) 181909, ¶ 21.

¶ 59        On appeal, the CTA argues that the video is security-sensitive information exempt from disclosure under the provision concerning security measures in section 7(1)(v) of FOIA (5 ILCS 140/7(1)(v) (West 2016)) because disclosure could reasonably be expected to jeopardize the effectiveness of the CTA's surveillance system. In support of its argument, the CTA provided three affidavits, the most important affidavit came from a homeland security expert,

Michael Fagel, Ph.D., who works for a national consortium that trains state and local emergency responders who averred that releasing the videos would publicize currently unknown security information such as the cameras' individual and collective fields of view and blind spots, which would enable potential attackers "to evade these security devices when targeting passengers, planning attacks, or evading capture by law enforcement."

¶ 60    In response to the CTA's arguments, the Sun-Times submitted affidavits from Patrick Eddington, a Cato Institute research fellow, and David Bradford, a former police officer and a director of Northwestern University's public safety center.

¶ 61    In his affidavit, Eddington challenged Fagel's assertion that video surveillance cameras in mass transit systems provide preventive or predictive security against any kind of assault or attack. Eddington averred that viewing the camera videos was not the only way to identify the cameras' field of view and blind spots. Eddington averred that any member of the public who can view surveillance cameras at CTA stations "can already determine with a reasonable degree of certainty whether any CCTV camera blind spots exist and the extent and location of those blind spots." Additionally, Eddington averred that whether or not an individual camera has blind spots could be determined by analyzing

> "the camera's field of view under factory settings; the placement of a given camera; the kind of lense(s) on the camera (wide angle, fish eye, etc.); whether software enhancement is used to improve the camera's field of view, resolution, etc.; and whether the camera in question is the sole source of video at the building or facility at which it has been place[d]."

Eddington also contended that revealing the cameras' blind spots would not endanger CTA security because there was "no evidence of any terrorist plot stopped in advance through video surveillance of a mass transit system."

¶ 62    Bradford also opined that viewing the video footage was not the only means to identify the field of view and blind spots. Specifically, mathematical formulas would reveal the camera's field of view. Also, there was "the rule of thumb" that "if you cannot see the camera, the camera cannot see you." Bradford opined that the easiest way to commit a crime without being detected would be to visit the facility and observe the location of the cameras and determine any blind spots. Bradford also opined that viewing the video footage might not reveal the total maximum area view available to the camera because that area view could be modified by the aperture setting for the lens. Bradford opined that releasing the camera footage "would in no way endanger CTA security" because, according to the CTA's press releases, the CTA's system was saturated with cameras that recorded criminal activity no matter where it occurred.

¶ 63    The trial court in the case at bar stated that the locations of the cameras were not easily detected from viewing the video footage at issue here and anyone on the station platform could determine the location of the blind spots. This was a determination of a factual issue that was material in this case. The court also stated that if the defendant in the criminal case had not pled guilty then the video footage would have been played in open court. Accordingly, the court, applying the clear and convincing evidence standard, concluded that the disclosure of the video footage "does not" and "would not in any way jeopardize the effectiveness of the [security] measures or the safety of the personnel who implement them or the public." As I have stated, a factual determination that can only be made after a trial on the merits, not on a motion for summary judgment.

¶ 64    I agree with the majority that the very broad language of section 7(1)(v) of FOIA illustrates that the CTA is required to prove, by clear and convincing evidence, that the release of the video could reasonably be expected to jeopardize the effectiveness of the CTA's security measures in order for the video to be exempt from disclosure. Although the words "could reasonably be expected to jeopardize" is a low standard, it cannot be met when there are contested facts.

¶ 65    I find that one of the major issues for the trier of fact to determine in the case at bar is whether someone on the station platform of the CTA can determine the location of the blind spots that the cameras cannot view. This issue cannot be determined on a motion for summary judgment because the affidavits show that a factual determination of this issue can only be made from a trial on the merits. In addition, the type of lenses used in the cameras, the aperture setting for the lenses at the time of the recording, the depth of field, the image's clarity, and whether any software enhancements are used to improve the camera's visual output are all issues that need to be determined before a court can make a finding that the release of the video could reasonably jeopardize the effectiveness of the CTA's security system.

¶ 66    As a result, I would deny each party's motion for summary judgment and remand to the trial court for a trial on the merits. After the factual issues have been decided, it is possible that the court could find that all of the video would be exempt, none of the video would be exempt, or only a portion of the video would be exempt.