2023 IL App (1st) 211657

No. 1-21-1657

Opinion filed March 2, 2023

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| IVAN GLYNN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CH 5370 |
| | ) | |
| THE DEPARTMENT OF CORRECTIONS, | ) | Honorable |
| | ) | Anna M. Loftus, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Hoffman and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff Ivan Glynn sued defendant, the Department of Corrections (DOC), seeking

disclosure under Illinois's Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2020))

of security video footage from the Joliet Treatment Center. The parties filed cross-motions for

summary judgment, and the circuit court, after declining to conduct an *in camera* review of the

video footage, granted summary judgment in favor of DOC and against Glynn.

¶ 2      On appeal, Glynn argues the circuit court erred by (1) applying broadly the FOIA

exemption for records related to or affecting the security of correctional institutions, (2) ruling that

DOC's affidavit was sufficient to prove the footage was exempt by clear and convincing evidence, and (3) holding that the existence of blind spots alone in prison surveillance footage was sufficient to exempt it from disclosure under FOIA.

¶ 3     For the reasons that follow, we reverse the circuit court's grant of summary judgment in favor of DOC and against Glynn and remand this matter for further proceedings.[1]

¶ 4                                    I. BACKGROUND

¶ 5     In November 2019, Glynn sent DOC a FOIA request for audio and video footage from the security cameras of the dayroom of the Joliet Treatment Center (Joliet) on November 11, 2019, and any footage of dorm 7 on November 12, 2019.

¶ 6     In December 2019, DOC denied the request, stating that DOC does not maintain or possess audio footage, and the video footage was exempt from inspection and copying pursuant to section 7(1)(e) of FOIA, which exempts from inspection and copying "[r]ecords that relate to or affect the security of correctional institutions and detention facilities." 5 ILCS 140/7(1)(e) (West 2018).

¶ 7     DOC cited a nonbinding April 21, 2014, determination letter issued by the Public Access Bureau (PAB) of the Office of the Illinois Attorney General, which concluded that disclosure of video footage from inside a correctional institution to a correctional officer depicting an incident in which he was injured would jeopardize security because it "would reveal blind spots that inmates could exploit to evade detection of actions that could endanger other inmates and/or staff members."

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8     In August 2020, Glynn sued DOC, and the parties briefed cross-motions for summary judgment.

¶ 9     DOC submitted an index of the records to which it denied access.[2] The index listed three video files. According to the index, two of those files, which were from two different cameras of the dayroom on November 11, 2019, showed portions of the dayroom, inmates within the dayroom, the position of prison guards, and the process for moving an inmate out of the dayroom. The third video, which was from a camera in dorm 7 on November 12, 2019, showed portions of dorm 7, the position and movement of prison guards, and the process for moving inmates from cells. DOC maintained that these surveillance videos were exempt from disclosure under FOIA's section 7(1)(e) because disclosure would jeopardize the security of the facility. In support of its motion, DOC attached the affidavit of Joel Diers and three nonbinding determination letters from the PAB, dated May 22, 2013, April 21, 2014, and July 20, 2016. In the alternative, DOC asked the court to conduct an *in camera* inspection of the videos if the court found that DOC's affidavit and the PAB letters failed to meet DOC's burden to establish by clear and convincing evidence that the requested records were exempt from disclosure.

¶ 10     In his affidavit, Diers averred that he was legal counsel for DOC and held this position for 13 years. He was familiar with the security camera system used by Joliet, which is a correctional facility. Its security camera system collected only video footage without any audio. In the course of his employment, Diers reviewed hundreds of videos from the cameras within DOC's facilities, and none of these videos contained audio. Diers averred that the three videos responsive to Glynn's

---

[2]DOC also stated that, pursuant to its retention policy, security camera video footage that does not reflect any incident is automatically purged after 30 days. As such, DOC no longer possessed some of the video responsive to Glynn's request.

request revealed the layout and structure of the dayroom and dorm 7 and the positioning of DOC staff members, such as prison guards, within these areas. The videos also showed the timing of staff movement and prisoner movement, including the process for moving prisoners.

¶ 11    Diers averred that "[m]ost significantly, the footage would allow individuals to determine the range of the facility's security cameras for the Dayroom and Dorm 7, which would expose areas that are not covered by these cameras ('Blind spots')." Diers stated that exposure of these blind spots would provide individuals with the knowledge of where dangerous acts, harm to others, or unpermitted activity could occur without detection from the security cameras. Diers averred that disclosure would also give individuals the knowledge of potential times and locations where these activities could occur without detection from DOC's staff because the individuals would know approximately when and where prison guards were present in those locations. Diers averred that these activities could be dangerous and harmful to others, placing DOC's staff and other inmates at significant risk. Diers stated that DOC properly withheld the video footage pursuant to FOIA's section 7(1)(e) because disclosure of the information contained in the footage would adversely affect the security of Joliet.

¶ 12    The three PAB determination letters concluded that video recordings of correctional centers' dining halls and a cellblock were exempt from disclosure under FOIA's section 7(1)(e) because the recordings captured most, but not all, of the areas in question and thus would reveal blind spots that inmates could exploit to evade detection of actions that could endanger other inmates and staff members. In reaching this conclusion, the PAB reviewed the video recordings at issue in all three matters.

¶ 13    In his motion for partial summary judgment, Glynn argued, *inter alia*, that DOC failed to prove by clear and convincing evidence that disclosure would affect security because DOC's claim that the footage revealed blind spots was flawed. To support this argument, Glynn cited the affidavit of Patrick C. Eddington, who worked for nearly 20 years in federal service dealing with intelligence and intelligence oversight matters, including nearly 9 years as a professional imagery analyst with the National Photographic Interpretation Center. He worked as a CIA analyst for several years, using multiple forms of imagery derived from multiple imaging platforms in the course of his analysis of military, internal security, and international events. He worked for then-United States Congress Representative Rush Holt for about 10 years evaluating the efficacy, safety, and constitutionality of various federal agency programs that used surveillance technologies. As a research fellow at the Cato Institute, Eddington researched and wrote about surveillance technology.

¶ 14    In his affidavit, Eddington challenged Diers's statement that releasing the surveillance footage would allow individuals to determine the range of security cameras and reveal their blind spots. Eddington stated that multiple pieces of information—including the camera's field of view under factory settings, whether the camera was zoomed in, the camera's placement and type of lens (wide angle, fish eye, etc.), use of software to enhance the field of view or resolution, and the number of cameras at the area in question—were necessary to determine whether an individual camera had any blind spots. Eddington averred that DOC's evidence did not indicate whether the cameras were concealed, and any person who could see the cameras in use could already determine with a reasonable degree of certainty the existence, extent, and location of any blind spots. Eddington averred that even if a viewer of the footage could definitively establish any blind spots,

other cameras in the same room could cover those other areas not visible on the requested cameras. Furthermore, Eddington averred that anyone present "can look and see for themselves where blind spots may be," citing the "simple maxim, 'If I can't see the camera lense [*sic*], the camera can't see me.' " Also, any person present could already see for themselves the positioning and movement of DOC staff and the movement of prisoners within those areas, and viewing these things in person was the most effective way to learn the locations of blind spots, staff, or prisoners. Eddington did not state that he viewed the videos at issue or the locations in question.

¶ 15    Glynn also supported his motion with an April 17, 2015, nonbinding determination letter from the PAB. In that matter, DOC had denied a request for all records related to a 2010 investigation of an incident that did not occur within the prison, arguing that a plain reading of FOIA's section 7(1)(e) allowed for a *mere relation* to the security of a correctional facility to render records exempt from disclosure. This letter concluded, *inter alia*, that DOC failed to meet its burden to prove that the records were exempt from disclosure under section 7(1)(e) of FOIA because it applies only when a public body demonstrates that disclosure of a requested record would pose a potential security risk to a correctional facility." Finally, Glynn asked the circuit court to defer ruling on the issue of civil penalties until the court resolved the merits of whether DOC violated FOIA.

¶ 16    On June 25, 2021, the court heard oral argument on the parties' cross-motions for summary judgment. The court granted DOC's motion and denied Glynn's motion. Accordingly, the court did not address Glynn's request for civil penalties. The court found that DOC's affidavit established by clear and convincing evidence that the video footage directly related to and affected the security of the correctional institution, and thus DOC met its burden to prove the requested

footage was exempt from disclosure under section 7(1)(e). The court noted that the language of section 7(1)(e) was "quite broad" and not qualified. However, even under a narrower construction of section 7(1)(e)—*i.e.*, that "related to" meant that a requested record would pose a potential security risk to a correctional facility—the court would still rule in favor of DOC. The court found that Diers's affidavit on behalf of DOC established that the footage revealed the layout and structure of the dayroom and dorm 7, the position and movement of DOC staff members and guards within those areas, prisoner movement, and the process for moving prisoners. The court also found that Diers's affidavit established that viewing the footage would reveal the range of the security cameras in the dayroom and dorm 7 and thus expose the cameras' blind spots, thereby establishing that release of the footage would create a potential security risk because individuals with knowledge of the blind spots could cause harm without detection from DOC staff.

¶ 17    The court stated that unlike Diers, who had 13 years' experience with DOC, had reviewed hundreds of videos from DOC security cameras, and knew the locations and reviewed the footage at issue here, Glynn's affiant, Eddington, did not view the footage or the locations at issue. The court also stated that Eddington's statement that an individual needed more information (like the camera's field of view under factory settings, the type of camera lens, whether software enhancements or the zoom function were used) than merely viewing the footage to determine the blind spots, was inconsistent with his statement that any person "who can see the cameras in use can already determine with a reasonable degree of certainty whether any camera blind spots exist and the extent and location of those blind spots." The court afforded the declarations of DOC, an agency, a presumption of good faith and found that the proven existence of blind spots in this

matter sufficiently established that the footage directly related to and affected the security of the correctional institution.

¶ 18    The court stated that an *in camera* review of the footage would not be effective because the court would need to do a site visit to see the rooms in question to understand the footage, and Diers's affidavit, which was entitled to a presumption of good faith, established his personal knowledge and that the footage did show blind spots. The court added that Glynn's arguments about previous disclosures of security camera footage by other correctional institutions were neither relevant nor compelling.

¶ 19    Glynn moved the court to reconsider, arguing that (1) newly discovered evidence from July 2, 2021, showed that the Illinois State Police released surveillance camera footage from an DOC facility of an officer beating an inmate; (2) DOC's interpretation of section 7(1)(e) creates the absurd result of shielding all prison security footage, including footage of guards abusing prisoners, from public scrutiny; (3) the court erroneously stated that viewing the footage would reveal information about the type of lenses the cameras used, the aperture settings, and whether any software enhancements were used, but DOC did not make this claim or present evidence to support it; and (4) the court stated that before it would consider DOC's previous release of surveillance footage as evidence favoring disclosure, the court needed information about the footage length, but that information was in the record.

¶ 20    The parties briefed the motion. On November 18, 2021, the court held oral argument on the motion and denied it. The court stated that Glynn misconstrued the court's findings that it needed more information about the circumstances of previous security camera footage disclosures (*i.e.*, whether the disclosures were made pursuant to FOIA, a settlement, or discovery) before the

court could consider the relevance of Glynn's arguments regarding those disclosures. Furthermore, Glynn misconstrued the court's quote of text from *Chicago Sun-Times v. Chicago Transit Authority*, 2021 IL App (1st) 192028, ¶ 50, regarding camera lens types, aperture settings, and software enhancements as the court's evidentiary findings and ruling in the instant case. Also, the court did not conclude that there was a *per se* exception for security footage under section 7(1)(e) when the footage reveals blind spots. Rather, the court looked at DOC's claim on a case-by-case basis. The court found that Diers's affidavit was specific and detailed, not generic, and his conclusions were supported by facts. Conversely, the court did not give credit to Eddington's affidavit.

¶ 21     Glynn timely appealed.[3]

¶ 22                                       II. ANALYSIS

¶ 23     This case arises from the disposition of cross-motions for summary judgment. Summary judgment is proper when the pleadings, depositions, admissions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020). Where the parties have filed cross-motions for summary judgment, they have conceded that there are no genuine issues of material fact and have agreed that only questions of law are involved. *Nationwide Financial, LP v. Pobuda*, 2014 IL 116717, ¶ 24. In such a situation, the parties request that the court decide the issues as a matter of law. *Id.* We review *de novo* the trial court's judgment on cross-motions for summary judgment. *Id.*; see *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 63 (under *de novo* review, the reviewing court performs the same analysis the trial court would perform).

---

[3]Glynn's appeal does not involve any issue concerning audio footage.

¶ 24    The Illinois Supreme Court has stated that

"FOIA expressly declares its underlying public policy and legislative intent. Section 1 provides that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of this Act. [Citation.] Section 1 explains that [s]uch access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest. [Citation.] Consequently, section 1 provides that [i]t is a fundamental obligation of government to operate openly and provide public records as expediently and efficiently as possible in compliance with this Act. [Citation.]

Based on this clear expression of legislative intent, this court has held that public records are presumed to be open and accessible. [Citation.] FOIA is to be liberally construed to achieve the goal of providing the public with easy access to government information. [Citation.] Consequently, FOIA's exceptions to disclosure are to be construed narrowly so as not to defeat the intended statutory purpose. [Citation.] Thus, when a public body receives a proper request for information, it must comply with that request unless one of FOIA's narrow statutory exemptions applies." (Internal quotation marks omitted.) *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶¶ 24-25.

If a public body invokes a FOIA exemption, it "has the burden of proving that [the record] is exempt by clear and convincing evidence." 5 ILCS 140/11(f) (West 2020).

¶ 25                                    A. Statutory Construction

¶ 26    The dispute here involves section 7(1)(e) of FOIA, which provides that the following shall be exempt from inspection and copying: "Records that relate to or affect the security of correctional institutions and detention facilities." *Id.* § 7(1)(e). The parties' contentions regarding section 7(1)(e) present a question of statutory interpretation, which we review *de novo*. *Calloway v. Chicago Police Department*, 2022 IL App (1st) 210090, ¶ 14.

¶ 27    When interpreting a statute, we must ascertain and give effect to the legislature's intent. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 24. The best indication of that intent is the language employed in the statute, given its plain and ordinary meaning. *Id.* When the statute's language is unambiguous, we may not depart from that language by reading into it exceptions, limitations, or conditions unexpressed by the legislature; likewise, we may not add provisions under the guise of interpretation. *Id.* Moreover, when the statute is unambiguous, we apply the statute without resort to other aids of statutory construction. *Palm v. Holocker*, 2018 IL 123152, ¶ 21.

¶ 28    However, when statutory language "leaves uncertainty as to how it should be interpreted in a particular context, the court can consider the purpose behind the law and the evils the law was designed to remedy." *Phoenix Bond & Indemnity Co. v. Pappas*, 194 Ill. 2d 99, 106 (2000). "A fundamental principle of statutory construction is to view all provisions of a statutory enactment as a whole. Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *Southern Illinoisan v. Illinois*

*Department of Public Health*, 218 Ill. 2d 390, 415 (2006). A statute should not be construed in a way that would defeat its purpose "or yield an absurd or unjust result." *Phoenix Bond & Indemnity Co.*, 194 Ill. 2d at 107.

¶ 29    DOC argues that it was entitled to summary judgment because it established that the requested security camera footage related to or affected Joliet's security, thus exempting the footage from disclosure under FOIA. DOC adds that it did not need to show whether release of the video affected security as long as the videos related to security. Giving section 7(1)(e) its plain and ordinary meaning, DOC contends it needed to show simply that the footage revealed information concerning Joliet's security. DOC argues this court should apply section 7(1)(e) as written, citing *Chicago Sun-Times*, 2021 IL App (1st) 192028, ¶ 44, for the proposition that when the General Assembly uses very broad language to define a FOIA exemption, this court applies the exemption as written.

¶ 30    In *Chicago Sun-Times*, this court held that security camera footage of a subway platform was exempt under section 7(1)(v) of FOIA (5 ILCS 140/7(1)(v) (West 2020)) as

> "security measures *** designed to identify, prevent, or respond to potential attacks upon a community's population or systems, facilities, or installations, the destruction *** of which would constitute a clear and present danger to the health or safety of the community, but only to the extent that disclosure could reasonably be expected to jeopardize the effectiveness of the measures, or the safety of the personnel who implement them or the public."

See *Chicago Sun-Times*, 2021 IL App (1st) 192028, ¶¶ 37, 43-44. DOC contends that, based on this court's analysis in *Chicago Sun-Times*, the language of section 7(1)(e) is at least as expansive as exemption 7(1)(v).

¶ 31    Glynn responds that DOC's interpretation of "relating to" would give section 7(1)(e) an expansive interpretation and render a broad category of public documents immune to public scrutiny, contrary to the intent of FOIA. Glynn argues that section 7(1)(e) of FOIA must be construed narrowly to further the statutory purpose to open governmental records to the light of public scrutiny. According to Glynn, this narrow construction should require DOC to prove that disclosure would actually affect security. Citing *Kalven v. City of Chicago*, 2014 IL App (1st) 121846, ¶ 19, *overruled on other grounds by Perry v. Department of Financial & Professional Regulation*, 2018 IL 122349, ¶¶ 19-22, Glynn argues that the court rejected the defendants' proposed broad interpretation of the phrase "related to" in the context of the FOIA exemption in section 7(1)(n) (5 ILCS 140/7(1)(n) (West 2012)), which exempts "[r]ecords relating to a public body's adjudication of employee grievances or disciplinary cases; [but does] not extend to the final outcome of cases in which discipline is imposed." *Kalven* held that this exemption did not apply to complaint register files (CRs) of completed investigations into allegations of police misconduct. In so holding, *Kalven* rejected the defendants' expansive reading of "related to," concluding, *inter alia*, that it was "at odds" with FOIA's purpose "to open governmental records to the light of public scrutiny." (Internal quotation marks omitted.) *Kalven*, 2014 IL App (1st) 121846, ¶ 19. *Kalven* concluded that the "phrase 'related to' must be read narrowly, and in the context of FOIA, CRs are not 'related to' disciplinary adjudications in a way that might exempt them from disclosure." *Id.* ¶ 22.

¶ 32    Glynn also argues that if the legislature had intended to exempt all DOC records related to security, then the "carve outs" of FOIA sections 7(1)(e-6) and (e-8) (5 ILCS 140/7(1)(e-6), (e-8) (West 2020)) would be superfluous because the records they exempt have some tangential connection to security. Specifically, sections 7(1)(e-6) and 7(1)(e-8) exempt, respectively, records requested by inmates (1) "if those materials include records from staff members' personnel files, staff rosters, or other staffing assignment information," and (2) "the disclosure of which would result in the risk of harm to any person or the risk of an escape from a jail or correctional institution or facility." *Id.* Glynn argues that DOC must show that disclosure actually affects security.

¶ 33    We reject Glynn's argument that DOC must show that disclosure actually affects security. Not only would such a standard fail to account for the lack of certainty in attempting to predict harm (see *Chicago Sun-Times*, 2021 IL App (1st) 192028, ¶¶ 39-40), Glynn's interpretation overlooks the disjunctive conjunction "or" between the terms "relate" and "affect." There is considerable overlap between the section 7(1)(e)'s requirement that the record must either relate to or affect the prison's security because a record cannot affect security unless it is related to security. Black's Law Dictionary defines "relate" to mean: "[t]o stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." Black's Law Dictionary 1288 (6th ed. 1990). The potential applicability of the term "relate" is extremely broad. Because DOC is responsible for maintaining custody over committed persons (see 730 ILCS 5/3-2-2 (West 2020)), most records that DOC possesses arguably relate to security in some way.

¶ 34    Accordingly, for purposes of 7(1)(e), the meaning of "relate" is ambiguous. Thus, section 7(1)(e) must be construed in the broader context of FOIA as a whole and the purposes of FOIA

"to provide the public with easy access to government information," that FOIA is to be afforded a liberal construction, and that a public body must disclose a requested record "unless one of the narrow statutory exemptions" applies. *Southern Illinoisan*, 218 Ill. 2d. at 415-17. Construing section 7(1)(e) in light of the purpose of FOIA and its other provisions, it better comports with FOIA to conclude that section 7(1)(e) applies to records that could jeopardize the security of a correctional institution or detention facility if disclosed, rather than any records merely pertaining to security in any manner whatsoever. We conclude that section 7(1)(e) applies only when a public body demonstrates that disclosure of a requested record could pose a potential security risk to a correctional facility.

¶ 35                                B. Sufficiency of DOC's Affidavit

¶ 36    Glynn argues that DOC failed to prove by clear and convincing evidence that the footage was exempt under FOIA's section 7(1)(e) because DOC's affidavit was generic, conclusory, and failed to address the specific footage in this case. Glynn also argues that the circuit court erred by relying on the affidavit without conducting an *in camera* review.

¶ 37    When a public body invokes one of the exemptions in section 7 of FOIA as grounds for refusing disclosure, it must give written notice specifying the particular exemption claimed to authorize the denial. *Illinois Education Ass'n v. Illinois State Board of Education*, 204 Ill. 2d 456, 464 (2003). Thereafter, if the party seeking disclosure of information under FOIA challenges the public body's denial in circuit court, the public body has the burden of proving that the records in question fall within the exemption it has claimed. *Id.*; 5 ILCS 140/11 (West 2020). "To meet this burden and to assist the court in making its determination, the agency must provide a *detailed* justification for its claim of exemption, addressing the requested documents specifically and in a

manner allowing for adequate adversary testing." (Emphasis in original.) *Baudin v. City of Crystal Lake*, 192 Ill. App. 3d 530, 537 (1989).

¶ 38    Section 11(f) of FOIA states that the court "shall conduct such in camera examination of the requested records as it finds appropriate to determine if such records or any part thereof may be withheld under any provision of this Act." 5 ILCS 140/11(f) (West 2020). However, the circuit court need not conduct an *in camera* review when the public body meets its burden to show that the statutory exemption applies by means of affidavits. *Illinois Education Ass'n*, 204 Ill. 2d at 469. Affidavits that are conclusory, merely recite statutory standards, or are too vague or sweeping are not sufficient to establish the public body's burden of proof. *Id.*

¶ 39    DOC argues that it met its burden of demonstrating by clear and convincing evidence that the requested footage would have revealed information concerning Joliet's security and thereby jeopardize the security of its staff and inmates through Diers's affidavit, which described the footage and the potential security risk posed by its disclosure.

¶ 40    Glynn, however, argues that DOC failed to provide a detailed justification for its claimed exemption and some objective indicia that the exemption applied under the circumstances. Specifically, Glynn argues that DOC failed to (1) establish that any blind spots even existed in the dayroom and dorm 7 by describing the layout of those rooms and stating whether the cameras were hidden or whether one camera captured the blind spots of another camera, (2) prove that a viewer of the footage could determine the location of any blind spots, (3) address whether blind spots can be ascertained from the ground by viewing the camera set-up in person, and (4) prove that knowing the location of any blind spots affected security because Diers's affidavit contained only a generic

recitation of potential harms that could occur if blind spots were revealed but did not address the security concerns of Joliet, the dayroom, or dorm 7 specifically.

¶ 41    Diers's affidavit stated that the videos show the layout of the dayroom and dorm 7 and the structure of these areas. The videos also show various aspects of staffing at the facility, namely the placement and movement of department staff members, including prison guards. The videos also disclose the range of the security cameras, which exposes potential areas that the cameras may not cover (blind spots). DOC stated that release of the videos would negatively impact the security of Joliet because the footage exposes significant aspects of the facility's security staffing placements, staff movements, inmate movements, and blind spots that viewers of the footage could use to evade detection of actions that could endanger other inmates and/or staff.

¶ 42    In determining whether Diers's affidavit provides a sufficient detailed justification for a section 7(1)(e) exemption and addresses the requested documents specifically and in a manner allowing for adequate adversary testing, we consider other cases that held the supporting affidavit was not sufficient to sustain the burden of proof.

¶ 43    In *Illinois Education Ass'n*, the issue presented was whether material the Illinois State Board of Education (Board) submitted to the Illinois Attorney General when requesting the Attorney General's opinion on a certain topic was protected from disclosure under FOIA's attorney-client exemption even though the Board knew that the requested opinion, which might quote the submitted material, would be made public. The Board submitted affidavits generally averring that the Board's opinion requests were made with the expectation that they would be maintained in confidence and that the Attorney General's office recognizes that such communications may be subject to the attorney-client privilege. *Id.* at 461-62. The supreme court

held that the affidavits submitted by the Board in support of the exemption were merely conclusory and inadequate to sustain the Board's burden of proof. *Id.* at 469. The court stated that a public body attempting to meet its burden to show that the attorney-client exemption of FOIA's section 7(1)(n) was applicable

> "may not simply treat the words 'attorney-client privilege' or 'legal advice' as some talisman, the mere utterance of which magically casts a spell of secrecy over the documents at issue. Rather, the public body can meet its burden only by providing some *objective* indicia that the exemption is applicable under the circumstances." (Emphasis in original.)
>
> *Id.* at 470.

Furthermore, the court stated that "*in camera* review by the circuit court is the most effective way for the public body to objectively demonstrate that the exemption claimed does, in fact, apply" because it "affords the benefits of an impartial arbiter without the risks accompanying public disclosure of the documents." *Id.* at 471 (citing *Baudin*, 192 Ill. App. 3d at 543 (McLaren, J., concurring) ("The trial court should be hesitant in determining a privilege exits based solely on the affidavits submitted by the defendant, for without an *in camera* review there is no external means to verify the truthfulness of the affidavits ***.")).

¶ 44    In *Day v. City of Chicago*, 388 Ill. App. 3d 70, 72 (2009), an inmate convicted of murder in 1994 sought in 2007 under FOIA the city police department's file of the murder investigation. The city denied the request based on the FOIA exemptions for on-going criminal investigations. *Id.* The court held that the city failed to provide a detailed justification for its claimed exemption because the police officers' affidavits contained sweeping generalities, were conclusory, and did

not adequately explain why the 17-year-old murder investigation was considered ongoing or how disclosure of the documents would obstruct the remaining investigation. *Id.* at 76.

¶ 45    In *Evans v. Federal Bureau of Prisons*, 951 F.3d 578, 581 (D.C. Cir. 2020),[4] a prisoner requested under federal FOIA surveillance footage of an incident where the prisoner was stabbed with a screwdriver in the inmate dining area. The defendant bureau denied the request based on the federal exemptions for the disclosure of records that could reasonably be expected to (1) constitute an unwarranted invasion of personal privacy and (2) disclose law enforcement techniques and procedures. To support this denial, the bureau submitted an affidavit that stated the footage contained the images of about 70 people and thus disclosure of the footage "may constitute an unwarranted invasion of privacy." (Emphasis and internal quotation marks omitted.) *Id.* at 586. The bureau argued that it lacked the technological capability to segregate images potentially responsive to the prisoner's request from the images of third parties on the video recordings. *Id.* at 582. The bureau also argued that the footage would show the location of video cameras and, thus, "prisoners could modify[ ] their criminal behavior to prevent detection and circumvent the methods law enforcement officers use to discover the existence of and investigate the conduct of prisoners." (Internal quotation marks omitted.) *Id.* at 587-88.

¶ 46    The *Evans* court ruled that the bureau's affidavit lacked reasonable specificity, was conclusory, and recited statutory language without demonstrating its applicability to the information withheld. *Id.* at 586-87. The court stated that the bureau did not explain why it could not at least isolate some screen shots or blur out faces. *Id.* at 587. The court also noted that the

---

[4]The "General Assembly patterned FOIA after the federal FOIA" and, thus, "Illinois courts often look to federal case law construing the federal FOIA for guidance in construing FOIA." *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶¶ 54-55.

affidavit failed to clarify whether the location of video cameras would be visible to inmates in the prison dining hall or "address the field of view of any or all of the cameras so as to reveal potential blind spots." *Id.* at 588.

¶ 47    Here, Diers's affidavit is vague regarding the layout of the rooms in question, the scope of the area covered by each of the cameras, the location of the blind spots, the images' clarity, and whether any of the cameras are hidden. DOC argues that if Diers's affidavit were more detailed and specific, it might reveal information protected by the FOIA exemptions. We do not question DOC's good faith on this subject. However, summary judgment on this issue requires DOC to show that there is no genuine dispute as to whether the placement of cameras is such that exposure of the video recording would in fact disclose blind spots and thereby jeopardize the security of Joliet. The problem of a more detailed affidavit revealing protected information can be avoided by submitting the material containing these details to the court for *in camera* review.

¶ 48    Furthermore, if the circuit court had conducted an *in camera* review of the footage and thereby confirmed Diers's averments regarding the existence of the blind spots, then DOC might have met its burden under section 7(1)(e). However, an *in camera* review did not occur here. The present record is not sufficient to support summary judgment, so an *in camera* examination by the court is necessary to determine whether DOC met its burden of proof. In summary, DOC's declaration is too unspecific on its own to establish that withholding the footage under the exemption is justified. Accordingly, we reverse the summary judgment granted in favor of DOC and remand the matter, directing the circuit court to conduct an *in camera* review of the footage.

¶ 49                                            C. Blind Spots

¶ 50     Glynn argues the circuit court erred by ruling that the existence of blind spots alone in prison surveillance footage was sufficient to exempt it from disclosure under section 7(1)(e). Glynn argues that "if the mere existence of blind spots for a single camera is sufficient to withhold surveillance footage, the Circuit Court's interpretation of section 7(1)(e) would, in effect, create a *per se* exemption of all prison surveillance footage, including footage that shows prison guards abusing prisoners." Glynn argues that any incident recorded would tangentially relate to security and be exempt, thereby rendering a broad category of public documents immune from public scrutiny even though the legislature did not specifically exempt these records outright. Glynn contends that this result contradicts our courts' requirement that FOIA exceptions to disclosure are to be read narrowly.

¶ 51     Glynn misconstrues the circuit court's ruling. The court clarified that its ruling was made on a case-by-case basis. We do not doubt that many prison surveillance camera footage will be found to be exempt under this court's interpretation of section 7(1)(e). Nevertheless, the circuit court's decision is dependent on several variables, including the type of room filmed, the contents of the footage; whether the recording is of most, but not all, of the room; and whether the agency demonstrates that disclosure of the footage would pose a potential security risk to a correctional institution or detention facility.

¶ 52     Finally, Glynn cites DOC's disclosure of footage in discovery and the Illinois State Police's disclosure of footage in response to a FOIA request to support Glynn's argument that the potential security risk posed by exposing blind spots is "undermined by the fact that footage from another DOC facility has been publicly released clearly depicting blind spots." Glynn, however, has

forfeited this argument by failing to cite any relevant authority to support the notions that disclosure of security footage to an opposing party in litigation and disclosure by the state police of different footage from a different correctional institution precludes DOC from invoking section 7(1)(e) in this case. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (opening brief must include "citation of the authorities *** relied on"); *1400 Museum Park Condominium Ass'n v. Kenny Construction Co.*, 2021 IL App (1st) 192167, ¶ 51 (party "forfeited *** argument for purposes of appeal by failing to cite any supporting authority").

¶ 53                           III. CONCLUSION

¶ 54    For the foregoing reasons, we reverse the circuit court's judgment in favor of DOC and against Glynn on the parties' cross-motions for summary judgment and remand this matter, directing the circuit court to conduct an *in camera* review.

¶ 55    Reversed and remanded.

*Glynn v. Department of Corrections*, **2023 IL App (1st) 211657**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CH-5370; the Hon. Anna M. Loftus, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew Topic, Josh Loevy, Merrick Wayne, and Shelley Geiszler, of Loevy & Loevy, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Chaya M. Citrin and Evan Siegel, Assistant Attorneys General, of counsel), for appellee. |