2023 IL App (1st) 231459

SECOND DIVISION
December 7, 2023

No. 1-23-1459

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| ILLINOIS ROAD AND TRANSPORTATION BUILDERS ASSOCIATION, FEDERATION OF WOMEN CONTRACTORS, ILLINOIS ASSOCIATION OF AGGREGATE PRODUCERS, ASSOCIATED GENERAL CONTRACTORS OF ILLINOIS, ILLINOIS ASPHALT PAVEMENT ASSOCIATION, ILLINOIS READY MIXED CONCRETE ASSOCIATION, GREAT LAKES CONSTRUCTION ASSOCIATION, AMERICAN COUNCIL OF ENGINEERING COMPANIES (ILLINOIS CHAPTER), CHICAGOLAND ASSOCIATED GENERAL CONTRACTORS, UNDERGROUND CONTRACTORS ASSOCIATION OF ILLINOIS, and ILLINOIS CONCRETE PIPE ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County<br><br>18 CH 02992<br><br>Honorable Alison C. Conlon, Judge Presiding |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| THE COUNTY OF COOK, a Body Politic and Corporate, | ) ) ) | |
| Defendant-Appellee. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     This is the third appeal and the fourth decision in the journey of plaintiffs, a group of

Chicago-area trade associations, to challenge Cook County's use of transportation tax revenue as

violative of a constitutional amendment adopted in 2016. See *Illinois Road & Transportation*

*Builders Ass'n v. County of Cook*, 2021 IL App (1st) 190396 (*Road I*); *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2022 IL 127126 (*Road II*); *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2022 IL App (1st) 221582 (*Road III*). In *Road I*, this court held that an amendment codified in article IX, section 11 of the Illinois Constitution (the Amendment) (Ill. Const. 1970, art. IX, § 11 (amended 2016)), did not apply to home-rule units like Cook County (the County); our supreme court disagreed and reversed in *Road II*. Plaintiffs then tried to challenge the County's proposed 2023 appropriations ordinance before it became law. We found the issue was not yet ripe for adjudication in *Road III*. But now, after years of litigation, the question of whether the County is complying with the Amendment is squarely before this court.

¶ 2    We have before us two judgments. One is a grant of summary determination of a major issue, in which the circuit court ruled that plaintiffs were unable to challenge the County's expenditures under previous fiscal years dating back to 2016. We affirm that judgment, though on different grounds. The second judgment denied summary judgment to plaintiffs and entered summary judgment for the County on the basis that the County's spending of transportation funds in fiscal year 2023 (FY 2023) complied with the Amendment. We vacate that judgment. The County has not established that its spending complied with the Amendment, nor have plaintiffs shown definitively that the County's spending violated the Amendment. We remand for further proceedings consistent with this opinion.

¶ 3                                  BACKGROUND

¶ 4    In 2016, the voters of Illinois approved the Amendment. See *id.*; *Road II*, 2022 IL 127126, ¶ 3. Generally speaking, the Amendment limits the government's spending of transportation-related revenues to transportation-related purposes. *Road II*, 2022 IL 127126, ¶ 3.

In 2018, plaintiffs filed suit, seeking a declaration that the County was improperly spending restricted transportation revenue.

¶ 5       After the supreme court decided in *Road II* that the Amendment applied to a home-rule unit like Cook County, the County established a Transportation-Related Home Rule Taxes Special Purpose Fund (Transportation Fund) to segregate tax revenues from transportation-related taxes. The County also hired a budgetary consulting firm, MGT, to review its proposed budget for FY2023 and determine how to allocate funds in compliance with the Amendment.

¶ 6       For the sake of understanding what the County and its expert did, we will preview the portion of the Amendment at issue here, which allows the government to spend transportation funds on "the costs of administering laws related to vehicles and transportation." Ill. Const. 1970, art. IX, § 11(b). Such costs, per the Amendment, are limited to "direct program expenses related to *** the enforcement of traffic, railroad, and motor carrier laws [or] the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." *Id.* § 11(c). So MGT's principal job was to review the County's operations to identify "direct program expenses" that related to either transportation "enforcement" or "safety."

¶ 7       The project lead and primary MGT consultant was Bret Schlyer. According to his affidavit, MGT began the process by reviewing a "tremendous amount of data" from 17 of the County's 19 departments. This data was collected over the course of "more than 100 calls and meetings with County personnel."

¶ 8       Using this data, MGT conducted an analysis of the County's budget to "identify direct program expenses associated with the [Amendment]." Schlyer defined a direct program expense:

"A 'direct program expense' as used in the Safe Roads Amendment and a 'direct expense' are essentially the same. The key point is that the word 'program' in the Safe

Roads Amendment is not synonymous with the word 'program' in the County budget.

Not all government entities define the term 'program' in their appropriation bills. And

different government entities use the word 'program' differently in their appropriation

bills."

¶ 9    MGT identified 12 departments whose functions included, to some extent, activities that related to the enforcement of traffic laws or the safety of roads. Those departments were Police, Community Corrections, Corrections (the Cook County Jail), State's Attorney, Public Defender, Adult Probation, Judiciary, Office of the Chief Judge, Social Service, Juvenile Probation, Clerk of the Circuit Court-Office of Clerk, and Juvenile Temporary Detention Center.

¶ 10    Based on its analysis, MGT concluded that these 12 departments would incur $384,087,595 in allowable expenses—expenses on which transportation funds could be spent pursuant to the Amendment.

¶ 11    For each of these departments, MGT applied a "cost allocation" approach, by which MGT determined what percentage of that department's activities consisted of transportation-related functions consistent with the Amendment. While MGT "presented the results at a department level," they "performed the analysis at a budgetary program level."

¶ 12    MGT thus produced a single number for each department that represented the total amount of each department's budget that involved work related to transportation—that is, again, functions related to the enforcement of traffic laws or the safety of roads.

¶ 13    MGT then collapsed its "budgetary program"-level analysis into a single number that represented the total amount of each *department's* budget that was transportation-related. While we need not go into each of these net allocation percentages, there is one that is particularly contested in this court—the Department of Corrections.

¶ 14 "MGT determined that 46.95% of the Department of Corrections budget could be allocated to Authorized Expenses for traffic and transportation vehicle-related offenses." MGT reached this conclusion by using a "four-date sample methodology" to estimate the number of inmates within the jail on transportation related offenses. This methodology involved sampling "one date per quarter during the one-year statistical period of MGT's Analysis." The use of one date per quarter was intended to "correct for any seasonality" in the inmate population. Based on his experience, Schlyer opined that, "while the number of individuals subject to confinement or community corrections may fluctuate over time, the relative makeup of the population does not materially change." MGT was "comfortable" that its analysis qualified as a good representation of the individuals under correctional control.

¶ 15 MGT also included administration and human resource expenses as part of its authorized expenditures "for several reasons. First, they are not indirect [expenses]. Second, when trying to identify the activities related to the program of administration of laws related to traffic and transportation, there cannot be, for example, a jail without administration, supervisory, or meal costs."

¶ 16 While MGT's analysis concluded that the 12 departmental budgets included $384,087,595 in allowable expenses, the County estimated a far smaller amount of transportation-related revenues in FY2023, the amount of $237,450,000. To reconcile those numbers and ensure that the budget self-balanced, MGT divided anticipated revenues ($237,450,000) by allowable expenses ($384,087,595) and reached an adjusted percentage of 62%.

¶ 17 To use an easy hypothetical example for illustrative purposes, if a particular department had $10 million in transportation-related expenses, the adjustment would allocate them only $6.2

million from the Transportation Fund. To use concrete examples, consider first the department of the State's Attorney. MGT's analysis allocated 27.3% of the State's Attorney's budget to transportation-related expenses, but the County only allocated 17% of that department's budget to transportation-tax dollars, or 62% of that original calculation. Another example, as noted above, concerns the Department of Corrections. MGT allocated 46.95% of the Corrections budget to transportation-related expenses; with the adjustment, that percentage was 29%.

¶ 18    Before its adoption, the County's appropriations ordinance for FY2023 was presented at a public hearing and posted online. Before the Cook County Board had taken a vote on that ordinance, plaintiffs sought a preliminary injunction to prevent the County from adopting it, claiming that MGT's analysis allowed the County to improperly divert transportation revenue to non-transportation purposes. See *Road III*, 2022 IL App (1st) 221582, ¶ 3. Ultimately, the circuit court denied that motion, finding that the plaintiffs failed to show that the County was improperly using transportation funds. *Id.* ¶ 9.

¶ 19    We affirmed, not on the merits, but because the matter was not ripe for review. *Id.* ¶ 27. We could not pass judgment on an ordinance that had not been adopted, any more than a court could ever rule on pre-enactment legislation; doing so would be rendering an advisory opinion. *Id.* We expressed "no opinion whatsoever on the merits of the arguments raised by the parties about what the [A]mendment does or does not require of the County's future appropriations ordinance." *Id.* ¶ 28. The County then adopted the proposed FY2023 appropriations ordinance, which went into effect on December 1, 2022.

¶ 20    So the fight returned to the circuit court. Before filing the preliminary injunction that led to the *Road III* appeal, the County had filed a motion for summary determination of a major issue, seeking a finding that the supreme court's decision in *Road II* had only prospective

application. Plaintiffs, on the other hand, argued that the *Road II* decision applied to every budget since the adoption of the Amendment in 2016. A week after we issued the mandate in *Road III*, the circuit court entered an order finding that the supreme court's decision in *Road II* applied prospectively only, commencing with the FY2023 budget.

¶ 21    In February 2023, plaintiffs officially challenged the FY2023 appropriations ordinance by filing a motion for summary judgment. As already previewed, plaintiffs principally complained that the County was being far too liberal in what it deemed to be "direct program expenses related to *** the enforcement of traffic, railroad, and motor carrier laws [or] the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." See Ill. Const. 1970, art. IX, § 11(c). Plaintiffs claimed that the County was spending hundreds of millions of transportation-related tax dollars for non-transportation purposes.

¶ 22    Within each of the 12 departments receiving money, the plaintiffs flagged several "examples" of the programs receiving funding. One of the most egregious, in plaintiffs' view, was the program within the Department of Corrections for "Central kitchen, laundry, and sanitation." They also flagged several administrative programs within various departments. The crux of their argument was that the Amendment "was intended to direct transportation funding to transportation purposes, not to prisons, criminal prosecutions and defense, or the general costs of running a government."

¶ 23    The County responded, much as they do in this court, that the Amendment broadly authorizes expenditures "related to" transportation. The County also claimed that Amendment authorized expenditures on matters related to "public safety." The County later filed a motion for summary judgment of its own, leaving the court with cross-motions.

¶ 24    In August 2023, the circuit court entered summary judgment for the County and against plaintiffs. The court concluded that the Amendment broadly authorized the County to spend transportation funds as the County had budgeted. First and foremost, the court disagreed with plaintiffs' claim that the County was spending money "on the 'general costs of running a government.' Instead, after a thorough review of its outside expert and internal budgeting team, the County is identifying certain traffic- and transportation-related direct expenses within larger budget pools and allocating them as Authorized Expenses."

¶ 25    The court continued that "part of the enforcement of traffic laws must necessarily include incarcerating certain inmates while traffic-related charges are pending." As many of the costs plaintiffs complained of, such as food and laundry, were part of that incarceration, they were necessarily part of enforcement, too. The court was cognizant of the fact that "[o]ut of context, one might question how laundry is related to transportation. But in context, it is apparent that the costs of laundering a traffic inmate's uniform is part of the chain of public safety." Thus, while plaintiffs were correct that the Amendment included several references to transportation infrastructure, the larger purpose of the Amendment allowed the County to broadly spend money on enforcing traffic laws and was not as limited as plaintiffs suggested.

¶ 26    This appeal followed.

¶ 27                              ANALYSIS

¶ 28    Now, for the first time, the question of which expenditures are authorized from transportation funds, and which are prohibited, is before this court. We appreciate that this decision comes as the FY2023 budget is wrapping up and the County's adoption of the FY2024 budget nears (if it has not already been adopted). This concern over revolving annual budgets segues to the first issue.

¶ 29                                                     I

¶ 30     We first review the circuit court's judgment that the supreme court's *Road II* decision has only prospective application. Plaintiffs wish to challenge the County's spending for every fiscal year since the Amendment was adopted; the County says that plaintiffs may only challenge County spending that occurred after the *Road II* decision.

¶ 31     In our view, that particular question is academic, for we resolve the issue of plaintiffs' challenges to expired appropriations on justiciability grounds. And while we are on the topic, we then address the justiciability of plaintiffs' challenge to the current FY2023 budget in this appeal.

¶ 32                                                     A

¶ 33     Regardless of whether *Road II* were deemed to have prospective or retroactive application, plaintiffs cannot seek injunctive relief against the County's expenditures in previous fiscal years, pursuant to expired appropriations ordinances, because those claims are moot.

¶ 34     An appeal is moot, among other reasons, "if events have occurred which foreclose the reviewing court from granting effectual relief to the complaining party." *In re Shelby R.*, 2013 IL 114994, ¶ 15. Controversies surrounding "budgetary issues where the budget year in question h[as] already passed" fall within the category of moot controversies. *Pace v. Regional Transportation Authority*, 346 Ill. App. 3d 125, 133 (2003).

¶ 35     In *West Side Organization Health Services Corp. v. Thompson*, 79 Ill. 2d 503, 504 (1980), a group of plaintiffs sought *mandamus* against the governor and other members of the executive branch to spend money that had been appropriated to them. While the case was ongoing, the appropriated funds lapsed to the general revenue fund by operation of law. *Id.* at 505-06. Our supreme court concluded that the issue was moot. It found that "[u]nder the circumstances here involved, the disputed $100,000 lapsed by operation of statute September 30,

1977, thereby preventing the issuance of *mandamus* to compel expenditure of the expired appropriations. [Citation.] The disputed $100,000 would accordingly be unavailable to satisfy plaintiffs' claims even if they were to prevail on the merits." *Id.* at 506.

¶ 36 More recently, our supreme court has reiterated that the courts cannot generally revisit old budgets. In *Wirtz v. Quinn*, 2011 IL 111903, ¶ 93, the plaintiffs challenged an appropriations bill as violative of our constitution's single-subject clause. Defendants argued that the issue was moot because "the 2009 fiscal year is over, and the appropriation authority created by Public Act 96-35 has lapsed." *Id.* ¶ 102. The supreme court agreed that it "cannot enjoin the legislature from appropriating funds pursuant to the provisions cited by plaintiffs because those provisions are no longer in effect. Because this court cannot grant effective relief, plaintiffs' claims regarding the challenged provisions are moot." *Id.*

¶ 37 The same is true here. Plaintiffs cannot obtain injunctive relief against spending in previous fiscal years under appropriations ordinances that have expired. We thus affirm the circuit court's judgment in favor of the County on this question, albeit on different grounds.

¶ 38                                    B

¶ 39 Because this opinion will be handed down, at the earliest, within days of the conclusion of FY2023, and because we are remanding for further proceedings, plaintiffs' claims for injunctive relief against the County's spending in FY2023 will become moot, as well, long before plaintiffs are able to obtain effective injunctive relief. But that does not mean that plaintiffs' claims for *declaratory* relief are nonjusticiable. There are two well-recognized exceptions to the mootness doctrine: (1) if the issue is capable of repetition yet evades review and (2) the public interest exception. *Pace*, 346 Ill. App. 3d at 133-34.

¶ 40    For the first exception, "there must be a reasonable expectation that the same complaining party would be subject to the same action again, and the duration of the challenged action must be too short to be fully litigated before its cessation." *Id.* at 133. That fits annual budgetary questions perfectly. In fact, the *Pace* decision specifically recognized that *legal* questions surrounding the validity of budgetary expenditures are continuing controversies that are not necessarily limited to a single budgetary year. *Id.*

¶ 41    The public-interest exception also applies here, as budgetary questions are a "matter of substantial public concern" that are likely to arise annually. *Id.* at 134. Judicial interpretation of the legal issues is necessary to guide the government to prevent future budgetary disputes. *Id.* Indeed, in *Wirtz*, 2011 IL 111903, ¶ 103, after finding any claim for injunctive relief moot given the lapse of appropriations, the supreme court found that the public-interest exception applied to the legal questions presented:

> "[T]he provisions challenged by plaintiffs continue to be employed by the General Assembly in current budget legislation. [Citations.] Given this fact and the clear public nature of the issues presented, as well as the desirability of a resolution of the questions presented, we conclude that the criteria of the public interest exception have been met."

¶ 42    Thus, we find the legal questions presented and plaintiffs' claims for declaratory relief concerning the County's spending in FY2023 to be justiciable, notwithstanding mootness, and on remand, the circuit court should do the same. It is long past time for the parties to have clarity on what the Amendment does and does not require of the County.

¶ 43                                   II

¶ 44    Plaintiffs seek a declaration that the County is violating the Amendment by spending hundreds of millions of dollars in transportation-related revenue for non-transportation-related

purposes. The resolution requires us to interpret the relevant portions of the Amendment, an issue of first impression. Our review is *de novo*. *Gregg v. Rauner*, 2018 IL 122802, ¶ 23.

¶ 45    In construing the constitution, our goal is to give effect to " ' "the common understanding of the persons who adopted it—the citizens of this state." ' " *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 35 (quoting *Walker v. McGuire*, 2015 IL 117138, ¶ 16). We first focus on the plain language of the provision. *Road II*, 2022 IL 127126, ¶ 33. If the language is clear, we give effect to it. *Id.* We will not rewrite a constitutional provision to add restrictions or limitations that were not included in the language. *Kanerva v. Weems*, 2014 IL 115811, ¶ 41. When terms are undefined, we turn to dictionaries to give them their "ordinary and popularly understood meaning." *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009).

¶ 46    The Amendment begins with the general limitation on spending. Subsection (a) provides that "[n]o moneys" derived from "taxes, fees, excises, or license taxes" from a transportation-related source shall be spent except as provided in subsections (b) and (c) of the Amendment. Ill. Const. 1970, art. IX, § 11(a). There is no claim here that the County is defining such taxes and fees improperly, so we will say nothing further on that point. For ease, we will refer to the revenue described in subsection (a) as "transportation funds," the title of the Amendment.

¶ 47    Subsection (b) lists the categories for which transportation funds may be spent. Many of those categories are not at issue in this appeal, including "payment of highway obligations; costs for construction, reconstruction, maintenance, repair, and betterment of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or other forms of transportation; and other statutory highway purposes." *Id.* § 11(b). They also include "the State or local share of highway funds to match federal aid highway funds, and expenses of grade separation of highways and railroad crossings, including protection of at-grade highways and railroad

crossings, and, with respect to local governments, other transportation purposes as authorized by law." *Id.*

¶ 48    Relevant here is the first category listed in subsection (b), which permits the spending of transportation funds on "the costs of administering laws related to vehicles and transportation." *Id.* What that phrase includes and does not include is the dispute here.

¶ 49    Subsection (c) is devoted entirely to defining that phrase. In pertinent part, it reads:

>       "(c) The costs of administering laws related to vehicles and transportation shall be limited to *direct program expenses* related to the following: the *enforcement of traffic, railroad, and motor carrier laws*; the *safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports \*\*\**." (Emphases added.) *Id.* § 11(c).

¶ 50    There are several places within this language on which the parties disagree. They disagree on what constitutes a "direct program expense." They disagree on whether the "program" or the "expense" must "relate to" transportation enforcement or safety. And they disagree on the extent to which either of those must "relate to" enforcement or safety. We address those issues in turn.

¶ 51                                          A

¶ 52    We begin with defining the phrase "direct program expenses." The parties have given us their observations about the meaning of each word, but neither party has cited a single source defining the *phrase*. It is obviously just that, a phrase, used more than once in subsection (c), but the parties have made no attempt to tell us what that phrase means. As best we can tell, it is a term of art unknown to Illinois law; no case law, statute, or constitutional provision uses that phrase, much less defines it.

¶ 53     Our own research has uncovered one example in a federal statute. Federal law allows Native American tribes to contract with the government to run federally funded services that the government would otherwise provide. *Cherokee Nation v. Leavitt*, 543 U.S. 631, 634 (2005); see 25 U.S.C. § 5301 *et seq.* (Supp. IV 2018). In return, the federal government reimburses the tribes for various costs and expenses of running the program. *Id.* § 5325(a). Among them are "(i) direct program expenses for the operation of the Federal program that is the subject of the contract" and "(ii) any additional administrative or other expense incurred by the governing body of the Indian Tribe or Tribal organization and any overhead expense incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract[.]" *Id.* § 5325(a)(3)(A)(i), (ii).

¶ 54     The statute thus distinguishes "direct program expenses" from administrative and overhead expenses, which the United States Supreme Court referred to as "indirect administrative costs." *Leavitt*, 543 U.S. at 635; see *Northern Arapaho Tribe v. Becerra*, 61 F.4th 810, 818-19 (10th Cir. 2023) (tribe's costs of generating and spending third-party revenue qualified as " 'direct program expenses,' " as contract contemplated that tribe would engage in that function).

¶ 55     For what it's worth, this same federal law also defines the similar phrases "direct program costs" and "indirect costs." Direct program costs are "costs that can be identified specifically with a particular contract objective." 25 U.S.C. § 5304(c) (Supp. IV 2018). Compare that to "indirect costs," which are "incurred for a common or joint purpose benefiting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefited without effort disproportionate to the results achieved." *Id.* § 5304(f).

¶ 56    By no means are these definitions controlling in our interpretation of the Amendment, but the clear takeaway is that "direct program expenses" are those that further the mission or objective of the program under contract, whereas administrative and overhead expenses incurred for a more general purpose, spread out over several programs, are "indirect" expenses.

¶ 57    The County's position, in part via its expert, is that we should think of "direct program expenses" as direct expenses, a more commonly understood term. Plaintiffs vehemently disagree, claiming that doing so is reading the word "program" out of the definition. But we can credit the County's position without reading out the word "program." After all, the adjective "direct" in "direct program expenses" modifies the noun "expenses." The fact that another word is placed between them does not change that fact; it just means that "expenses" has two modifiers, not one. Indeed, the phrase "direct program expenses" could be restated as "direct expenses of a program" without changing the meaning one iota. So in trying to define the phrase, it is not only permissible but necessary to consider the phrase "direct expenses."

¶ 58    Not that the phrase "direct expenses" gets us very far, in and of itself. We know from the dictionaries and common parlance that an "expense" is "[a]n expenditure of money *** to accomplish a result," a "financial burden or outlay," or "the money that something costs you or that you need to spend in order to do something."[1]

¶ 59    We also know that, though the worlds of accounting and finance distinguish between the terms, the word "cost" is generally understood to have roughly the same meaning as "expense." See *International Bureau of Fraud Control, Ltd. v. Clayton*, 188 Ill. App. 3d 703, 710 (1989)

---

[1] See, respectively, *Expense*, Black's Law Dictionary (11th ed. 2019); Merrian-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/expense (last visited Nov. 12, 2023) [https://perma.cc/4XZC-D7QH]; Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/expense (last visited Nov. 12, 2023) [https://perma.cc/R9B9-X7NM].

("The words 'costs' and 'expenses' in their popularly understood sense are synonyms."). The average citizen voting on this Amendment would generally understand as much. See *League of Women Voters of Peoria v. County of Peoria*, 121 Ill. 2d 236, 243 (1987) ("common understanding" of voters is "determined by referring to the common meaning of the words used" in provision). And that is particularly true given that the Amendment itself—the very language at issue—uses the words almost interchangeably. See Ill. Const. 1970, art. IX, § 11(c) ("The *costs* of administering laws related to vehicles and transportation shall be limited to direct program *expenses* related to the following ***." (Emphases added)).

¶ 60    Which brings us to "direct costs," as opposed to "indirect costs." Black's defines a "direct cost" as "[t]he amount of money for material, labor, and overhead to produce a product," while an "indirect cost" is a "cost that is not specific to the production of a particular good or service but that arises from production activity in general, such as overhead allocations for general and administrative activities." *Cost*, Black's Law Dictionary (11th ed. 2019).

¶ 61    That definition sounds a lot like the definitions in the federal statute we cited governing contracts with Native American tribes. So we have a workable definition. "Direct" expenses of a program are those specific to the particular program or objective, such as the materials, equipment, and supplies necessary to execute that program, or wages for employees performing that program-specific function. They are not to be confused with "indirect" costs or expenses that apply more generally across more than one program, such as the costs of utilities (gas, heat, electricity, water) for a building in which employees perform several different functions or programs, or general administrative functions like recordkeeping or human resources, whose work is not limited to one particular program but operates companywide.

¶ 62     Now we define "program." As it happens, the County appropriates money to "programs" within each department of government. "Programs," in fact, is defined in its appropriations ordinance as "[t]he functional units of a County Department or Agency focused on particular objectives and further delineated with employee and cost data specific to that function."

¶ 63     Our interpretation of a constitutional provision cannot be controlled by one unit of local government's definition, of course; this constitutional amendment applies, says our supreme court, to every unit of government, home-rule or otherwise, from state government down to the smallest village. See *Road II*, 2022 IL 127126, ¶ 54. And we would imagine, among the multiple thousands of units of local government in Illinois, at least some of them do not use the same definition of "program" in their appropriations ordinance and may not use the term at all.

¶ 64     But plaintiffs endorse the County's definition, and it appears that the dictionaries define the word "program" similarly as a "plan or system under which action may be taken toward a goal" or "a plan or procedure for dealing with some matter."[2]

¶ 65     So a "program" is properly understood as a functional operation within a governmental entity directed at a specific objective or goal. And a "direct expense" of that "program" is an expense specific to carrying out that objective or goal, as opposed to an "indirect" expense that would apply across multiple objectives or goals.

¶ 66                                          B

¶ 67     To introduce the next textual dispute, we reprint the relevant text of subsection (c). That subsection, in pertinent part, provides that "[t]he costs of administering laws related to vehicles

---

[2] See, respectively, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/program (last visited Nov. 12, 2023) [https://perma.cc/59W9-M395]; Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/program (last visited Nov. 12, 2023) [https://perma.cc/TE57-HVT5].

and transportation shall be limited to direct program expenses related to" the "enforcement of traffic, railroad, and motor carrier laws" or "the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." Ill. Const. 1970, art. IX, § 11(c).

¶ 68     Plaintiffs argue that, in order to receive funding from transportation funds, the "program" must be "related to *** the enforcement of traffic, railroad, and motor carrier laws" or "the safety of highways, roads," and the like. In plaintiffs' view, none of the programs receiving transportation tax revenue from the County fall within these categories, and thus all the County's expenditures violate the Amendment.

¶ 69     We agree with the County, however, that plaintiffs are misreading the Amendment. Subsection (c) does not require that the *program* relate to those enforcement or safety categories; it requires that the particular "expense" relate to those categories.

¶ 70     That is the only conclusion we can draw from the plain language and basic rules of grammar. In the phrase "direct program expense," the word "expense" is the operative noun that must "relate to" enforcement or safety. True, the word "program" is also a noun, but here it is acting as a modifier, much like the adjective that precedes it, "direct." The modifying noun "program" is serving as an "attributive noun" or "adjunct noun"—a "noun that is directly adjacent to, in English usually preceding, the noun it modifies," a noun that "qualifies or completes the meaning of another word or other words *and is not itself a main structural element in its sentence*."[3]

---

[3]  See, respectively, Dictionary.com, https://www.dictionary.com/browse/attributive (last visited Nov. 12, 2023) [https://perma.cc/B6DJ-7LTB]; Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/adjunct (last visited Nov. 12, 2023) [https://perma.cc/C3KM-ASJS] (emphasis added).

¶ 71    Attributive nouns are commonplace in our everyday speech and would certainly be recognizable, if not by name, to the average voter. We eat "chicken soup" and "turkey sandwiches" and "Halloween candy;" we drink from "coffee cups" and check the "expiration dates" on our "milk cartons;" we ride on "school buses" or "commuter trains;" we watch "baseball games" and "tennis matches" or visit "movie theaters;" we shop at a "shoe store" or "car dealership;" we go to "birthday parties" and sing in "church choirs." Indeed, the title of the Amendment, "Transportation Funds," contains an attributive noun. Ill. Const. 1970, art. IX, § 11.

¶ 72    Courts routinely recognize attributive nouns in contracts or statutes. See, *e.g.*, *Hanover Insurance Co. v. Binnacle Development, LLC*, 493 F. Supp. 3d 585, 589-90 (S.D. Tex. 2020) (construing statutory term "government contract" and noting that "words such as 'district' and 'government,' when they precede 'contract,' function as attributive nouns (i.e., nouns that modify other nouns)"), *aff'd*, 57 F.4th 510 (5th Cir. 2023); *In re Tolliver*, No. 20-22408-gmh, 2020 WL 5869070, at *1 (Bankr. E.D. Wis. Sept. 28, 2020) (in construing phrase "original payment schedule," noting that " 'payment,' a noun, is used as an adjective, or attributive noun, to modify the noun "schedule' "); *Mondelez Global LLC v. United States*, 253 F. Supp. 3d 1329, 1332-33 (Ct. Int'l Trade 2017) ("The phrase 'food preparation' is simply an attributive noun, 'food,' followed by another noun, 'preparation.' "); *Imbrie v. State Farm Fire & Casualty Co.*, No. CV-08-888-ST, 2008 WL 4737950, at *6 (D. Or. Oct. 24, 2008) (construing phrase "advertising ideas" in insurance policy; word "ideas" was "modified by the word 'advertising,' which functions as an attributive noun in this context"); *Delgadillo v. Astrue*, 601 F. Supp. 2d 1241, 1245-46 (D. Colo. 2007) (" '[a]ttorney fees' employs 'attorney' as a noun adjunct to 'fees' ").

¶ 73    A typical (though not universal) trait of attributive nouns is that, because they are modifiers, they remain singular even when the noun they modify is plural. See *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1383 (Fed. Cir. 2016) (attributive or adjunct nouns "are typically singular, whether they refer to single or multiple objects"). So, we say "school buses," "government contracts," "payment schedules"—or in the Amendment, "program expenses" (Ill. Const. 1970, art. IX, § 11(c)).

¶ 74    In all these examples, the first noun modifies the second but does not serve as the operative noun in the phrase. If we say, "The shoe store is closed," it is the store that is shuttered, not the shoe. The statement "The church choir was excellent" expresses no opinion on the church itself. "The birthday party was fun" does not refer to the day of birth but the celebration. "The car salesman was great" is not a reflection of the automobile but the person selling it.

¶ 75    So when the Amendment limits spending to "direct program expenses related to" enforcement of traffic laws or safety of roads (Ill. Const. 1970, art. IX, § 11(c)), it is the *expenses* that must relate to transportation enforcement or safety, not the program. There is simply no other way to read it without bastardizing the English language.

¶ 76    Plaintiffs insist that the Amendment requires that the *program* relate to transportation enforcement or safety. Imagine how incredibly easy it would have been to say that. As noted above, another way to say "direct program expenses," without changing the meaning, is "direct expenses of a program." Had the framers chosen that language—if the word "program" immediately preceded the phrase "related to"—it would obviously require that the "program" relate to transportation enforcement or safety. But they chose the language they chose. We cannot rewrite that language, particularly when doing so would lead to a dramatically different

interpretation; we must apply the plain language the framers chose and the citizens read before casting their ballots. See *Road II*, 2022 IL 127126, ¶ 33; *Kanerva*, 2014 IL 115811, ¶ 41.

¶ 77                                              C

¶ 78     Putting this all together, under subsection (c), the government may spend transportation funds on any expense that satisfies these two requirements: (1) the expense must be a direct expense of a program—it must be specific to the mission of that program or function, not an indirect expense like overhead or administration that applies more generally across multiple objectives or programs; and (2) the expense itself, regardless of the program in which it is incurred, must be "related to *** the enforcement of traffic, railroad, and motor carrier laws" or "the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." Ill. Const. 1970, art. IX, § 11(c).

¶ 79     Though the plain language of the Amendment dictates this interpretation, we would add that, contrary to plaintiffs' objection, our interpretation is perfectly consistent with the purpose and spirit of the Amendment. First and foremost, every single authorized expenditure under subsection (c) must relate to transportation enforcement or safety, consistent with the singular focus of the Amendment—that transportation funds be spent only for transportation purposes. And second, by limiting authorized expenses to direct expenses of a program, the framers ensured that more indirect costs like overhead and administration that have only a tangential connection to transportation would not be paid for with transportation-generated tax dollars.

¶ 80                                              D

¶ 81     One textual dispute remains. Again, under subsection (c), transportation funds may be used to pay for "direct program expenses related to *** the enforcement of traffic, railroad, and

motor carrier laws" or "the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." *Id.* What does it mean to be "related to" enforcement or safety?

¶ 82    The phrase "related to" is not an especially vexing phrase. "[R]elated" means "[c]onnected in some way; having relationship to or with something else." *Related*, Black's Law Dictionary (11th ed. 2019). Both the United States and Illinois Supreme Courts similarly define it as " 'having a connection with, or reference to,' a certain subject matter." *Village of Mundelein v. Wisconsin Central R.R.*, 227 Ill. 2d 281, 290 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). It is generally viewed as having an expansive meaning. See *id.*; *Glynn v. Department of Corrections*, 2023 IL App (1st) 211657, ¶ 33 ("The potential applicability of the term 'relate' is extremely broad.").

¶ 83    At times, however, given the surrounding language, courts have feared that the phrase could have the potential of unlimited and thus *unintended* breadth. One example is a federal law that preempted " 'all state laws insofar as they *** relate to any employee benefit plan' covered by ERISA." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 655 (1995). Though the Supreme Court noted the expansive breadth, the Court cited two reasons to resist an overly broad interpretation. The first was the general presumption against preemption, absent a clear expression of Congress. *Id.* at 654-55. Second, given the broad reach of ERISA itself, the preemption could be nearly limitless and would "read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." *Id.* at 655. The Court thus narrowed the interpretation of the phrase to better align with the objectives of ERISA. *Id.*; see *Scholtens v. Schneider*, 173 Ill. 2d 375, 382-83 (1996) (discussing *Travelers*).

¶ 84   Likewise, in *Glynn*, 2023 IL App (1st) 211657, ¶ 26, we construed an exemption in the Freedom of Information Act for " '[r]ecords that relate to or affect the security of correctional institutions and detention facilities.' " (quoting 5 ILCS 140/7(1)(e) (West 2020)). We recognized that nearly all records of the Illinois Department of Corrections would fall under this exemption, thus undermining the intent of the statute: "[b]ecause [IDOC] is responsible for maintaining custody over committed persons [citation], most records that [IDOC] possesses arguably relate to security in some way." *Id.* ¶ 33. We thus limited the exemption to "records that could jeopardize the security of a correctional institution or detention facility if disclosed, rather than any records merely pertaining to security in any manner whatsoever." *Id.* ¶ 34.

¶ 85   But this is not one of those unique cases where such a limiting gloss is required, as in those decisions. Again, the "direct program expenses" must be "related to *** the enforcement of traffic, railroad, and motor carrier laws; the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." Ill. Const. 1970, art. IX, § 11(c). These categories are somewhat broad but by no means capable of limitless application. We can think of no reason why the average voter, reading this Amendment, would interpret "related to" in any way other than the relatively broad manner in which it is customarily viewed.

¶ 86   And we say again that the drafters of the Amendment *already* narrowed the scope of the entire phrase by requiring that only direct, not indirect, expenses of a program may be spent on these transportation purposes. The clear import of that distinction was to disallow expenditures on costs that have only a tangential or remote connection to transportation, such as the cost of electricity to power the building devoted to a number of different government functions.

¶ 87   We thus consider a direct program expense to be "related to" transportation enforcement and safety if it is connected in some way with those categories specified in the Amendment.

¶ 88                                            E

¶ 89    With the terms and phrases defined, we now turn to the complaints plaintiffs raise about

the manner in which the County is spending transportation funds. We reiterate that to be eligible

for transportation funding, an expense must be both (1) a direct expense of a program and (2) an

expense that is connected in some way to transportation enforcement or safety. If either of these

preconditions is not satisfied, the County may not use transportation funds to pay for them. And

each of these preconditions is relevant in analyzing the challenged expenditures.

¶ 90                                            1

¶ 91    Among others, plaintiffs point to a number of programs that involve administrative and

recordkeeping functions, which we summarize below based on department and the program's

title and description (and which we have taken from plaintiffs' brief):

| Department | Program | Description |
|---|---|---|
| Corrections | Records | Reviews, updates, and maintains all court-related documents for individuals remanded into custody and discharged. |
| Adult Probation | Administration | Supervises departmental operations and manages administrative functions. |
| Juvenile Probation | Executive Administration | Governance of the organizations including alignment of operations and programs with vision and mission, budget, policy, and overall direction of the court system. |
| Social Services | Clerical support services | Performs data entry tasks and reception duties including answering, screening, and directing calls. |
| State's Attorney | General Administrative | Provides administrative support services across a range of operations, including MIS, mail room, warehouse facility, law library, and law clerk and paralegal services. |
| Circuit Court Clerk | Finance | Manages departmental financial operations and activities. |

| Circuit Court Clerk | Data entry | Responsible for the data entry of court activities into the electronic court management system. |
|---|---|---|

¶ 92     Plaintiffs argue that these expenses in no way "relate to" transportation enforcement or safety. But our objection is that the expenses generated by these activities are what we have described as "indirect" costs or expenses that apply generally across multiple objectives or even department-wide, as opposed to "direct" expenses specific to a single objective. True, one could argue that, if the program or objective is given the title "administration," then any administrative activity is central to *that* objective, and thus all expenses incurred are "direct" expenses. But that would permit an end-run around the Amendment; the government cannot avoid its constitutional limitations by manipulating the grouping of activities or program titles. Imagine if the County named a program "Indirect Costs," lumped all such costs under that program, and then argued that they were *direct* costs simply because they pertained to the program's mission.

¶ 93     No, the Amendment promised the voters that only direct expenses of a program would be eligible for transportation funds. Allowing the County to group indirect costs into one program with a title reflecting them, magically transforming those costs into "direct" program expenses, would violate that promise.

¶ 94     It was thus error to uphold the spending of transportation funds for programs like these. For that reason (among others we discuss below), summary judgment for the County was improper, and we vacate and remand.

¶ 95                                                   2

¶ 96     Next, plaintiffs argue that several programs over various departments that receive transportation funding are not "related to *** the enforcement of traffic, railroad, and motor carrier laws" or "the safety of highways, roads, streets, bridges, mass transit, intercity passenger

rail, ports, or airports." See *id.* Thus, they say, no expenses from these programs, even direct ones, are eligible for transportation funds.

¶ 97    We have already explained that the Amendment does not require that the *program* "relate to" transportation enforcement or safety; it requires that the *expenses* (the direct ones) within the program so relate. So we reject plaintiffs' program-level argument. But if we leave things there, as we could, we would be remanding to the circuit court with a number of unanswered questions that would likely prompt yet another appeal. Judicial economy dictates that we answer the question, which essentially remains the same, regardless of whether we view the question from the "program" level or the "expenses" level: Do various departments of County government— Corrections, the State's Attorney, the Public Defender, the Office of Chief Judge, to name a few—incur any expenses at all that "relate to" transportation enforcement or safety?

¶ 98    Plaintiffs say in a blanket manner that the answer is no. They say, for example, that the County Jail has nothing to do with the "enforcement of traffic, railroad, and motor carrier laws" or "the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports." See *id.* So it would follow, under this logic, that not a single expense within the Department of Corrections qualifies for transportation funding.

¶ 99    Plaintiffs also vehemently challenge the circuit court's reasoning to the contrary, which essentially agreed with the County that one of the purposes of the Amendment was "public safety" and that incarcerating inmates for transportation-related expenses was part of the "chain of public safety." Plaintiffs insist that "public safety" is not a purpose of the Amendment and emphasize that the phrase "chain of public safety" appears nowhere in the Amendment.

¶ 100   On this latter point criticizing the circuit court's reasoning, we too would prefer to focus on the Amendment's text. We agree with plaintiffs and disagree with the County and circuit

court on the purpose of the Amendment. The purpose of the Amendment is to ensure that transportation funds are spent for one and only one thing—transportation purposes, as defined. The reference to "safety" in subsection (c) aside, this Amendment is not generally concerned with public safety. And we would thus refrain from justifying any government expenditures based on a chain-of-public-safety theory.

¶ 101   The question, in our view, is whether these various departments conduct any activities, and thus incur any direct program expenses, "related to *** the enforcement of traffic, railroad, and motor carrier laws." See *id.* Said simply, what does the "enforcement of *** laws" mean?

¶ 102   Back to the dictionaries. Within the definition of "enforcement," Black's defines "law enforcement" as "[t]he detection and punishment of violations of the law." *Law Enforcement*, Black's Law Dictionary (11th ed. 2019). "[P]unishment" means "a fine, penalty, confinement, or loss of property, right, or privilege—assessed against a person who has violated the law." *Punishment*, Black's Law Dictionary (11th ed. 2019). A law is "enforce[d]" by making "sure that it is obeyed, usually by punishing people who do not obey it." Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/enforce (last visited Nov. 12, 2023) [https://perma.cc/EQA7-9TVL].

¶ 103   Those definitions strike us as perfectly natural understandings of the phrase "enforcement of laws," more typically stated as "law enforcement"—the detection and punishment of violations of the law. And thus the phrase "related to *** the enforcement of traffic, railroad, and motor carrier laws" means related to the detection and punishment of violations of traffic, railroad, and motor carrier laws.

¶ 104   The path from detection of crime to punishment of crime has many stops along the way, invoking various functions of county government. Police officers (including but not limited to

county sheriff's police) enforce traffic laws. The result of an adverse interaction with a police officer is a criminal charge, be it a misdemeanor or felony, whether it leads to a mere citation or arrest. Some traffic-related arrestees are taken to a county jail, at least initially. And some are detained in that jail until trial. Defendants are later prosecuted for their traffic offenses by the state's attorney's office in a case that is heard in court by judges. If they are convicted, depending on the length of the sentence, they might even be incarcerated in county jail, too.

¶ 105   If police officers enforce the law, and if law enforcement extends to punishment, then every stop along the way from arrest to postconviction incarceration is "related to *** the enforcement of *** laws." That much seems clear. The bigger question is how far that extends.

¶ 106   Does it extend, for example, to the Public Defender? We believe so, because defendants are constitutionally entitled to government-provided counsel if they cannot afford an attorney. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006); *People v. Baez*, 241 Ill. 2d 44, 104-05 (2011); U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/113-3(b) (West 2014). It is not possible to enforce the traffic laws without providing a public defender to defendants who require one; the prosecution of a defendant who is denied counsel is structural error, the resulting conviction subject to automatic reversal. See *People v. MacTaggart*, 2019 IL App (3d) 160583, ¶ 20. The constitutionally-required services of a public defender, to the extent that the office defends traffic-related offenses, is clearly connected in some way to the enforcement of transportation laws.

¶ 107   Perhaps the thorniest question, and the most heated on appeal, involves the Department of Corrections. If the pretrial detention of an arrestee is part of the "enforcement" of traffic laws, what about all the different things that factor into the sheltering, security, and care of detainees?

¶ 108   The one receiving the most attention from the parties is the program within the Department of Corrections known as "Central Kitchen, Laundry, Sanitation." Plaintiffs argue that things like laundry have no possible connection with transportation enforcement. On the surface, it is hard to disagree with that. But again we must consider, as did the circuit court, the constitutional requirements that accompany the detention of individuals prior to trial or even incarceration post-trial.

¶ 109   It is well settled that the government owes detainees a constitutional duty to provide them with "humane conditions of confinement," which means ensuring that "inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). And as we said regarding the Public Defender, a constitutionally necessary aspect of the enforcement of laws is sufficiently "related to" the enforcement of those laws under the Amendment. Thus, to the extent that the County Jail is incurring expenses to provide such constitutionally required necessities to detainees, those expenses are "related to" the enforcement of traffic laws.

¶ 110   It is also clear from the County's appropriations ordinance that, in many instances, some of the individual expenses incurred within these departments will be a mix of transportation-related and non-transportation-related expenses. We can imagine many examples, like wages for correctional guards who secure individuals detained for both traffic-related offenses and other offenses. When the jail purchases food for the detainees, some of that food goes to traffic-related detainees, the rest to other detainees. A sheriff's police officer might spend part of her time patrolling the roads for traffic violations or DUI checkpoints and other time performing other police work. A prosecutor or public defender might litigate both traffic- and non-traffic-related cases; the same may be true of judges hearing a mix of such cases.

¶ 111    Nothing in the Amendment prevents the County from breaking up expenses into one part transportation-related and one part otherwise. All the Amendment requires is that transportation funds be spent for transportation purposes; there is nothing prohibiting the government from using transportation funds to satisfy part of an expense, as long as it is the part related to a defined transportation purpose. So if expenses are mixed, so be it; as long as the government ensures that it is only using transportation funds for the portion of those expenses related to transportation enforcement, the Amendment is satisfied.

¶ 112    That is easier said than done, of course, because splitting those "mixed" expenses requires knowing how much of the expense should be prorated to transportation enforcement. And that may be a difficult thing to know, particular at the beginning of a fiscal year. But if the County chooses to spend its transportation funds in the way it is doing—as opposed to, for example, simply appropriating transportation funds to the Department of Transportation for road construction and the like—it will have to justify any prorations it calculates.

¶ 113                                                                F

¶ 114    That dovetails into our final point, and the principal reason that we must vacate the trial court's judgment that the County's FY2023 spending complies with the Amendment. The long and short is that we do not know if the County's spending did or did not comply with the Amendment, because we do not know how the County spent its transportation funds.

¶ 115    From what we can tell—which is not enough at this stage—it appears that at least some of the County's expenditures violate the Amendment. For one thing, earlier in this opinion, we noted several programs contained in a chart (taken from plaintiffs) that do not qualify as "direct" expenses and thus are not eligible for payment from transportation funds. So if the County is, in

fact, spending transportation funds on those programs, as it appears, those expenditures are constitutionally impermissible.

¶ 116    But the problem is far larger than that. The bigger point is that we do not know on which expenses the County is spending transportation funds. We only have the appropriations ordinance containing the legislative authority to spend. We have not seen the *actual expenses*.

¶ 117    That is a problem, because the constitution is not concerned with how the County appropriates transportation funds. It is concerned with how the County *spends* transportation funds. Appropriations are a necessary component, but they are a means to the end, not the end itself.

¶ 118    In a simple case, this might not make a difference. Had the County appropriated all its transportation funds into some road-construction program within the Department of Transportation, we likely would not need to look under the hood at each individual expense, because it would probably be clear from the appropriations that all expenses would be for a transportation-related purpose. (And we likely would not have this lawsuit at all.) But the County has not done that. It has appropriated its transportation funds to 12 other departments that contain a mix of expenses—some transportation-related, some not.

¶ 119    That complicates matters greatly. The County is free to choose that route, but if it does, the manner in which it spends transportation funds will become much more difficult to justify under the Amendment.

¶ 120    To distinguish between what we know and do not know on this record, consider the County's explanation of how it implemented the Amendment's requirements before and during FY2023. It came via an affidavit submitted by Annette Guzman, the Director of the County

Department of Budget and Management Services (DBMS), whose job is probably best understood, in her words, as Cook County's "Budget Director." Her explanation is as follows.

¶ 121   First, as noted earlier, before drafting the appropriations ordinance for FY2023, the County (via its expert) came up with calculations for each of 12 departments, determining for each one the percentage of expenses it was expected to incur that related to transportation enforcement or safety. Then the County adjusted each percentage down to 62% of the original percentage, given that estimated transportation tax revenue for FY2023 was only 62% of estimated transportation-related expenses.

¶ 122   Armed with that adjusted percentage for each department, the County then appropriated money from the Transportation Fund to each of the 12 departments and appropriated the remaining percentage from the Public Safety Fund. We will use as an example the Police Department. That department had a budget of $82 million. The County's adjusted percentage for transportation-related expenses was 39% of the Police budget, which amounts to $32 million. So to the Police Department, the County appropriated $32 million from the Transportation Fund and the remaining $50 million from the Public Safety Fund.

¶ 123   Then FY2023 began, and actual expenses were incurred. Each month, as the Police Department incurred expenses, the County paid for them with money from the Public Safety Fund, regardless of whether they were transportation-related or otherwise. The idea, quite clearly, was that the County would start by paying for *every* expense with Public Safety Fund dollars out of caution—there is no constitutional limitation on spending from *that* fund—and then "true up" with the Transportation Fund later. The County performed this reconciliation in two different ways.

¶ 124   First, it did so monthly. Every month, the County would transfer a sum of money from the Transportation Fund to the Public Safety Fund. The sum was the same every month; the County simply took one-twelfth of the total $32 million appropriated to the Transportation Fund, and then apparently again out of caution, took only 80% of that number. Doing the math for the Police Department (one-twelfth of $32 million times 0.80), that meant that every month, the County transferred $2.1 million from the Transportation Fund to the Public Safety Fund.

¶ 125   Meanwhile, on a rolling basis, the Comptroller was monitoring transportation-related expenses incurred by the Police Department. As best we understand, the Comptroller was examining each expenditure by the Police Department and determining which qualified as transportation-related expenses and which did not.

¶ 126   That led to the second, more specific attempt at reconciliation. Every quarter—every *three* months—the County would compare *actual* transportation-related expenses against the amount of money automatically transferred each month from the Transportation Fund to the Public Safety Fund ($6.3 million, or $2.1 million times three months). If the actual amount of transportation-related expenses were greater than $6.3 million, the County would transfer the difference from the Transportation Fund to the Public Safety Fund. For example, if actual transportation-related expenses over a three-month period for the Police Department were $8 million, the County would transfer $1.7 million more from the Transportation Fund to make up the difference.

¶ 127   The County performed that process every month, and every quarter, for each of the 12 departments that were appropriated Transportation Fund dollars.

¶ 128   So that is what we know, at least as best we could interpret the Guzman affidavit. What we do *not* know includes this: which expenses qualified for the Comptroller's list of

transportation-related expenses? How do we know that the Comptroller properly designated each and every expense as related to transportation enforcement or safety?

¶ 129   There is no way for us to know, because we have not seen the actual expenses. Presumably, the Comptroller has a (long) list of transportation-related expenses among 12 different departments deemed eligible for transportation funds, but the County has not shared it with us.

¶ 130   We also do not know if the County attempted to "split" certain expenses into one part transportation-related and one part not. We already gave examples of expenses that might be a mix of the two, such as food in the County Jail, some of which is served to transportation-related inmates and the rest to all other detainees. Did the County "split" those expenses and, if so, was the percentage split correct?

¶ 131   Summary judgment must be clear and free from doubt. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 335 (2004). A good deal of doubt remains. The questions we have identified above are critical to any attempt by the County to obtain summary judgment in its favor. If the County identified expenses as eligible for transportation funds that, in fact, were ineligible, then the reconciliations and chargebacks the County performed were based on incorrect data.

¶ 132   There may be other issues concerning the methodologies or calculations, not to mention the manner in which the County moved money between the funds via chargebacks and reconciliations. We do not purport to list every possible question here or limit arguments or challenges the parties might raise on remand.

¶ 133   Given the parties' respective positions below, none of this was worked out in the circuit court. Plaintiffs took an entirely different approach, swinging for the home run, so to speak; they claimed that the County could spend transportation funds only on *programs exclusively related*

*to transportation*, and not a single one of the programs in any of these 12 departments were exclusively related to transportation. So from plaintiffs' view, there was no need for an examination of individual expenses, because *every* expenditure of transportation funds in the FY2023 budget violated the Amendment. We have rejected that approach as inconsistent with the plain language of the Amendment. So the denial of summary judgment in favor of plaintiffs was proper.

¶ 134   And the County, for its part, did not dive into the minutiae, either, simply explaining its methodologies and prorations and claiming its appropriations ordinance set forth a constitutional plan of spending. That, too, is insufficient. A plan is fine, but the execution of that plan—the actual spending—is what matters. If the County is going to spread transportation funds over departments that contain a mix of transportation- and non-transportation-related expenses, it will have to explain which expenses were paid for with transportation funds and which were not, so the court can decide for itself whether the actual spending complied with the constitution.

¶ 135   So while we would have preferred to settle all matters in this appeal, and we have attempted to provide the interpretative framework for the Amendment, we simply cannot answer the ultimate question here—whether the County's actual spending, in fact, complied with the Amendment. We affirm the denial of summary judgment for plaintiffs. We vacate the entry of summary judgment in favor of the County and remand for further proceedings.

¶ 136                                    III

¶ 137   Plaintiffs argue that all or parts of the affidavits submitted by the County should be stricken, as the affiants—Guzman and Schlyer—testified to legal conclusions. Because we have granted plaintiffs (at least part of) the relief they requested, a resolution of this question is not essential to the outcome of this appeal. But given our remand, we briefly address this issue.

¶ 138    It is certainly true that neither an expert nor any other witness can tell the court how to interpret the law. See *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369, ¶ 36. But sometimes experts find themselves opining on matters that are the subject of a statute or regulation. A doctor opines that a defendant is "dangerous" within the meaning of the Sexually Violent Persons Commitment Act. See *In re Commitment of Holt*, 2022 IL App (1st) 210402, ¶ 63. Or an expert in trucking testifies that someone was an "employee" under federal law. *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶¶ 77, 78.

¶ 139    It is the difference between "ultimate-issue testimony, which is permitted, and legal conclusions, which are not." *Roberts v. Zimmerman*, 2021 IL App (2d) 191088-U, ¶ 98; see Ill. R. Evid. 704 (eff. Jan. 1, 2011). It is a line that is admittedly "difficult to discern." *Zimmerman*, 2021 IL App (2d) 191088-U, ¶ 100; see *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶ 85.

¶ 140    One of the principal reasons this distinction is important is that allowing an expert to render a legal conclusion invades the province of the court to instruct the jury. *Zimmerman*, 2021 IL App (2d) 191088-U, ¶ 100; see *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶ 84. But here, there was no jury. See *Zimmerman*, 2021 IL App (2d) 191088-U, ¶ 105 ("in the context of a bench trial, [] there is less danger that a slight usurpation by the witness of the court's role to instruct the fact-finder as to the law will result in confusion or prejudice, for the obvious reason that the court is the fact-finder. In a bench trial, the trial court is presumed to know the law and consider only proper evidence in making its judgment.").

¶ 141    Had the circuit judge given any indication that she relied on the constitutional expertise of the affiants, we would obviously be concerned. But in denying the motion to strike, the court

made every point we have just made above. The court fully understood its independent province to interpret the constitution.

¶ 142    These affidavits were a mix of lay and expert testimony, mostly the former. The two affiants were clearly experienced in such areas as cost allocation and budgeting. But more than anything, they explained *what the County did to comply with the Amendment*. That information was vital for the court to understand whether the County's approach was constitutional.

¶ 143    Units of government must comply with the constitution every day. Most of the things government does is controlled by well-settled principles and does not require detailed constitutional analysis on a daily basis. But the Amendment is new, at least to the County, which until recently did not even believe that the Amendment governed its spending.

¶ 144    So what does a unit of government do? It attempts to understand what the constitution requires of it. It reads phrases like "direct program expenses" in the Amendment, tries its best to understand what it means, and then executes a plan based on that understanding. It makes a judgment about what it means for an expense to be "related to" transportation enforcement or safety and then acts accordingly. The County literally had no other choice but to take its best stab at compliance, which inescapably includes constitutional interpretation, and then explain itself to the court. If the affiants are not permitted to explain how they understood their constitutional mandate, how can they explain to the court why they did what they did?

¶ 145    Yes, some of the language in these affidavits appeared to cross the line from ultimate-issue testimony to constitutional interpretation. Most glaring was the language in the Guzman affidavit, where she opined that she implemented an FY2023 budget that "complies with the County's constitutional obligations." The court could have stricken that testimony. If such testimony were ever to reach a jury's ears, we would say that the court could either "strike or

qualify the offending phrase" to the jury. *Id.* ¶ 102; see *McHale*, 2015 IL App (1st) 132625, ¶ 98. But here, as the court made it clear that it understood its exclusive province and did not read the affidavits for any legal conclusions, no prejudice occurred.

¶ 146                                    CONCLUSION

¶ 147    The judgment of the circuit court, denying plaintiffs' challenges to all fiscal years preceding Fiscal Year 2023, is affirmed. The court's denial of summary judgment to plaintiffs is affirmed. The entry of summary judgment in favor of defendant with regard to its Fiscal Year 2023 spending is vacated. The cause is remanded for further proceedings consistent with this opinion.

¶ 148    Affirmed in part and vacated in part; cause remanded.

***Illinois Road & Transportation Builders Ass'n v. County of Cook*,
2023 IL App (1st) 231459**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CH-02992; the Hon. Alison C. Conlon, Judge, presiding. |
| **Attorneys for Appellant:** | John M. Fitzgerald, Michael J. Grant, Amanda N. Catalano, and Tae Y. Kim, of Tabet DiVito & Rothstein LLC, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney (Jessica M. Scheller and Jonathon D. Byrer, Assistant State's Attorneys, of counsel), and Kenneth S. Ulrich, David E. Morrison, Rachel C. Steiner, W. Kyle Walther, and Stacey E. Petrek, Special Assistant State's Attorneys, of Goldberg Kohn Ltd., both of Chicago, for appellee. |